UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO.: 08-21566-CIV-GOLD/McALILEY

NOEL DOORBAL,

       Petitioner,

vs.

WALTER A. MCNEIL,

       Respondent.

_____/

<u>ORDER DENYING DOORBAL'S PETITION FOR WRIT OF HABEAS CORPUS;
CLOSING CASE</u>

       This cause is before the Court on Noel Doorbal's ("Doorbal" or "Petitioner") Petition for Writ of Habeas Corpus [DE 1]. Having reviewed the Petition and Memorandum of Law in support thereof, the Government's Response, Doorbal's Reply, the Government's Surreply, and the Government's Motion to Strike Claim III,[1] as well as pertinent parts of the record and the applicable law, and having heard oral argument on August 21, 2008, I deny Doorbal's Petition.

I.    <u>FACTUAL BACKGROUND</u>

       The facts of this case were thoroughly presented by the Florida Supreme Court upon its review of Doorbal's direct appeal, *see Doorbal v. State*, 837 So.2d 940, 944 (Fla.2003) ("Doorbal I"); Florida's review of Doorbal's Petition for Interlocutory Appeal, *see Doorbal v. State*, 888 So. 2d 621 (Fla. 2004)(Case No. No. SC04-1484, "Doorbal II"); and Florida Supreme Court's combined order affirming the denial of Doorbal's post-conviction relief and denying his state petition for writ of habeas corpus, *see Doorbal v. State*, 983

_____

[1] Doorbal did not respond to the State's motion to strike.

So.2d 464 (Fla. 2008) (Case Nos. SC05-383 & SC06-1490, "Doorbal III").  I incorporate the

Florida Supreme Court's factual recitations in *Doorbal I-III* to this Order, and need not

repeat it here.  Nonetheless, for ease of discussion, I include this brief summarize from the

state court's order:

> A jury convicted Noel Doorbal of first-degree murder (two counts), conspiracy
> to commit racketeering, racketeering, kidnapping (two counts), armed
> kidnaping, attempted extortion, grand theft (two counts), attempted
> first-degree murder, armed robbery, burglary of a dwelling, first-degree
> arson, armed extortion, and conspiracy to commit a first-degree felony. *See*
> *Doorbal v. State*, 837 So.2d 940, 951 n. 30 (Fla. 2003). These convictions
> arose from the abduction, extortion, and attempted murder of Marc Schiller,
> and the abduction, attempted extortion, and murder of Frank Griga and
> Krisztina Furton. *See id.* at 944-50. For each murder, the jury recommended
> the death penalty by a vote of eight to four. *See id.* at 951. In accordance
> with that recommendation, the trial court sentenced Doorbal to death for both
> murders. *See id.* Although trial proceedings were consolidated with those of
> codefendants Daniel Lugo and John Mese, the charges against Doorbal and
> Mese were considered and determined by the same jury, while the charges
> against Lugo were evaluated by a separate jury. *See Lugo v. State*, 845
> So.2d 74, 97 n. 31 (Fla. 2003).

*Doorbal III,* 983 So.2d at 469.

Petitioner raised the following issues in his direct appeal: (1) warrants secured to

search Doorbal's apartment, home, and vehicle were not supported by probable cause; (2)

witnesses for the State made improper statements directed to the propensity of Doorbal

to commit bad acts or to highlight his bad character; (3) during guilt phase closing

arguments, the prosecutor improperly commented on Doorbal's right to remain silent and

asserted a "golden rule" argument; (4) during penalty phase closing arguments, the

prosecutor improperly commented on mitigation evidence and argued to the jury that

Doorbal should receive "no mercy"; (5) the trial court erroneously refused to admit letters

to Doorbal that had been written by Lugo as evidence of mitigation; (6) the trial court

erroneously found both the aggravating circumstances of pecuniary gain and murder committed while in the course of a kidnaping, which created an improper doubling because the aggravators arose from identical facts; (7) improper doubling occurred when the trial court erroneously found both the CCP and avoid arrest aggravating circumstances, both of which were without evidentiary support; and (8) Florida's capital sentencing scheme is unconstitutional under *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) because the aggravating circumstances do not have to be charged in the indictment, the jury does not have to specify what aggravators it found, and the jury recommendation of a death sentence did not have to be unanimous. *See Doorbal I* at 952-62. The Florida Supreme Court denied relief on all claims and affirmed the convictions and sentences. *See id.* at 944. The United States Supreme Court denied certiorari review on the question of "[w]hether *Hildwin v. Florida*, 490 U.S. 638 (1989), was overruled by *Ring v. Arizona*, ___ U.S. ___, 122 S. Ct. 2438, 2443 (2003), which held that the right to trial by jury guaranteed by the Sixth and Fourteenth Amendments applies to the fact-finding necessary to impose a sentence of death?" *Doorbal v. Florida*, 539 U.S. 962 (2003).

Subsequently, Doorbal filed a timely motion for post-conviction relief under rule 3.851, in which he raised twenty-one claims: (1) Florida Rule of Criminal Procedure 3.851 is unconstitutional on its face and as applied to Doorbal; (2) Section 119.19 of the Florida Statutes and Florida Rule of Criminal Procedure 3.852 are facially unconstitutional and as applied to Doorbal; (3) State agencies improperly withheld files and records that pertained to Doorbal's case in violation of chapter 119 of the Florida Statutes; (4) the State improperly withheld impeachment evidence because it failed to disclose that Marc Schiller

was under federal investigation for Medicare fraud, and presented false or misleading evidence during the trial when it allowed Schiller to falsely testify that he was not involved in Medicare fraud; (5) the trial of Doorbal was fraught with procedural and substantive errors that could not be considered harmless when viewed as a whole; (6) the trial court violated the constitutional rights of Doorbal when it denied various motions, which included a motion for a new trial; (7) Rule Regulating the Florida Bar 4-3.5(d)(4) is unconstitutional because it prohibits interviews of jurors by counsel to determine if constitutional error was present; (8-17) trial counsel was ineffective for (a) failing to withdraw prior to trial when he experienced severe financial hardship and personal crises which rendered him incapable of focusing on his duty to represent Doorbal; (b) the failure to object to the introduction of "bad character" evidence and prosecutorial misconduct during closing argument; (c) the failure to investigate Doorbal's claim of innocence pertaining to the Schiller counts, the failure to develop defenses to these counts, and the failure to retain experts to testify in support of the claim of innocence; (d) the failure to investigate Doorbal's claim of innocence pertaining to the Griga/Furton counts, the failure to develop defenses to the first-degree murder charges, and the failure to retain experts to testify in support of the claim of innocence; (e) the failure to properly proffer letters written by codefendants Lugo to Doorbal; (f) the failure to obtain an adequate mental health evaluation and the failure to provide necessary background information to the mental health consultant; (g) the failure to adequately prepare and investigate mitigating evidence; (h) the failure to secure consular access to Doorbal, who is a citizen of Trinidad, and the failure to object to the denial of consular access to Doorbal by the State; (I) the failure to successfully move for severance of claims, severance of defendants, and bifurcation of juries; and (j) the failure

4

to request that the jury be instructed that mercy and sympathy are proper considerations in the penalty phase and the failure to object to improper argument by the State that Doorbal should receive no mercy; (18) Florida's sentencing scheme is unconstitutional because it fails to prevent arbitrary and capricious imposition of the death penalty; (19) the convictions and sentences are unconstitutional under *Ring v. Arizona*; (20) the death sentences are unconstitutional because the penalty phase jury instructions improperly shifted the burden to Doorbal to demonstrate that death was inappropriate, and counsel was ineffective for the failure to object to these instructions; and (21) execution by electrocution or lethal injection constitutes cruel and unusual punishment. *See Doorbal III* at 473, n. 2.[2]  The trial court ultimately denied all claims.

Petitioner appealed the denial of his motion for post conviction relief to the Florida Supreme Court, raising six issues: (1) Petitioner was denied due process when the trial court judge refused to disqualify himself after testifying in federal court on behalf of a material witness convicted of crimes he lied about committing during Petitioner's trial; (2) the trial court erroneously denied Petitioner's motion to depose assistant state attorneys in light of evidence discovered in public records that reveals prosecutorial misconduct. Further, the trial court erred when it failed to conduct an evidentiary hearing to address

---

[2]

Before his post-conviction motion was heard, Petitioner filed a petition for review of a non-final order denying his motion for leave to depose the prosecutors in the Florida Supreme Court, raising the sole issue of whether prohibiting the deposition of prosecutors who called an "indispensible" state witness who laid the predicate for the death penalty when the state knew that their "crucial" witness was testifying falsely during Petitioner's trial departs from the essential requirement of law.  On November 3, 2004, the Florida Supreme Court dismissed the interlocutory review without prejudice. *Doorbal v. State*, 888 So. 2d 621 (Fla. 2004) ("*Doorbal II*").

Petitioner's claim that a *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) violation deprived him of due process and a fair trial; (3) in violation of Petitioner's rights to equal protection and due process in a criminal proceeding, twenty of twenty-one factually-disputed claims of ineffective assistance of counsel, trial error and prosecutorial misconduct were summarily denied.  Petitioner is entitled to an evidentiary hearing on all twenty-one claims; (4) Petitioner's amended motion to vacate convictions and sentences was erroneously struck by the trial court depriving Petitioner of due process and a full and fair adversarial testing; (5) the trial court erred when it denied a good cause motion for continuance to prepare for an evidentiary hearing in what the court determined was an extraordinary case.  Petitioner was denied due process and an evidentiary hearing for all factually-disputed claims is warranted; (6) without conducting an evidentiary hearing, Petitioner's motion to vacate his judgments of convictions and sentences of death was erroneously denied in violation of his constitutional rights to equal protection and due process.  Further, the trial court's amended order failed to provide guidance for appellate review.  *See generally Doorbal III.*

Concurrent with the filing of his brief in the post-conviction appeal, Petitioner also filed a petition for writ of habeas corpus in the Florida Supreme Court, raising 11 claims: (1) appellate counsel was ineffective for failing to raise or discuss the trial court's error in denying a motion to continue sentencing and relief on the *Brady* issues addressed throughout Petitioner's trial, particularly following Schiller's pre-arranged arrest on the courthouse steps; (2) appellate counsel was ineffective for failing to raise or discuss the trial court's error in denying defense motions for continuance when trial counsel's father died and his mother was still in the hospital when Petitioner's trial began; (3) appellate

6

counsel was ineffective for failing to raise or discuss the trial court's error in denying defense counsel's motions to withdraw; (4) appellate counsel was ineffective for failing to challenge the trial court's error in denying the defense motions to sever codefendants for trial; (5) appellate counsel was ineffective for failing to challenge the trial court's error in denying the defense motions to sever counts of the indictment; (6) appellate counsel was ineffective for failing to raise or discuss the trial court's error in denying the defense motion for new trial; (7) appellate counsel was ineffective for failing to properly challenge the trial court's error in denying the defense motions to declare the death penalty unconstitutional for impressibly doubling aggravators; (8) appellate counsel was ineffective for failing to raise or discuss the trial court's error in denying penalty phase defense counsel's motions to withdraw; (9) appellate counsel was ineffective for failing to raise or discuss the trial court's error in refusing to approve funds for defense experts; (10) appellate counsel was ineffective for failing to raise or discuss the trial court's error in overruling the defense objections to the medical examiner's testimony. The trial court's admission of inflammatory photographs whose potential for unfair prejudice outweighed any probative value; (11) appellate counsel was ineffective for failing to raise or discuss the trial court's error in denying defense motions to suppress evidence. *See generally Doorbal III.*

The Florida Supreme Court considered the post-conviction appeal and state habeas petition together, affirmed the denial of post conviction relief and denied state habeas relief. *See Doorbal III.* The instant federal habeas petition was timely filed.

In the instant Petition, Doorbal has presented four claims:

(1)    Doorbal was denied due process when Judge Ferrer rejected his motion to disqualify the judge, despite the fact that Doorbal had a well-grounded fear that Judge Ferrer could not be impartial [with

respect to the Schiller issues].

(2)    The State called a crucial witness [Schiller] at trial, both during the guilt phase and during the penalty phase, who lied about his own criminal conduct, but the State permitted this false testimony to stand uncorrected [in violation of *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed..2d 104(1972)].

(3)    Doorbal was denied due process of law when Judge Ferrer refused a good cause motion for continuance of an evidentiary hearing due to Judge Ferrer's decision to leave the bench and begin a television career.[3]

(4)    Doorbal received ineffective assistance from trial counsel.[4]

(*See* Petitioner's Preliminary Memorandum, DE 7).  I discuss each claim below.

## II.    STANDARD OF REVIEW FOR HABEAS RELIEF

Review of Doorbal's habeas petition is limited by the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA").  Thus, I may only grant relief if the state court adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

---

[3]

In his Reply [DE 14], Petitioner recharacterized Ground III as being "based on the denial of his rights under *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). Judge Ferrer recognized the claim and gave Doorbal access to mental health professionals for evaluation. When he was unable to comply with the Court's schedule, the claim was denied without hearing." (Reply at p. 17). In response, the Government filed a Motion to Strike Claim III of Petitioner's Reply [DE 16].  I discuss the proper characterization of Petitioner's third ground and the Motion to strike in section III.3 below.

[4]

Doorbal argues that he received ineffective assistance of counsel because Judge Ferrer denied these claims in an incorrect application of *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and with no consideration of *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980).

28 U.S.C. § 2254(d); *Gilliam v. Sec'y for the Dep't of Corr.*, 480 F.3d 1027, 1032 (11th Cir. 2007).

The Supreme Court has explained that the phrase "'clearly established Federal law . . . 'refers to the holdings of [the Supreme Court's] decisions as of the time of the relevant state-court decisions." *Williams v. Taylor*, 529 U.S. 362, 412, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000). To be "contrary to" clearly established federal law, the state court must either (1) apply a rule "that contradicts the governing rule set forth by Supreme Court case law," or (2) reach a different result from the Supreme Court "when faced with materially indistinguishable facts." *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2003). For a writ to issue because the state court made an "unreasonable determination of the facts," the petitioner must rebut "the presumption of correctness [of a state court's factual findings] by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Gilliam*, 480 F.3d at 1032.

The Eleventh Circuit has clarified the means by which a reviewing court considers whether a state court's decision constituted an "unreasonable application" of clearly established federal law. Under the law of this Circuit,

> [a] state court decision is an "unreasonable application" of clearly established law if the state court unreasonably extends or fails to extend a clearly established legal principle to a new context. . . . An application of federal law cannot be considered unreasonable merely because it is, in our judgment, incorrect or erroneous; a state court decision must also be unreasonable. . . . Questions of law and mixed questions of law and fact are reviewed de novo, as is the district court's conclusion regarding the reasonableness of the state court's application of federal law.

*Jennings v. McDonough*, 490 F.3d 1230, 1236 (11th Cir. 2007) (citing *Williams v. Taylor*, 529 U.S. 362, 412, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000)).

Moreover, "a state court's decision is not 'contrary to ... clearly established Federal

law' simply because the court did not cite [Supreme Court] opinions.... [A] state court need not even be aware of [Supreme Court] precedents, 'so long as neither the reasoning nor the result of the state-court decision contradicts them.'" *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003)(quoting *Early v. Packer*, 537 U.S. 3, 7-8 (2002). Even where a state court denies an application for post-conviction relief without written opinion, that decision constitutes an "adjudication on the merits," and is thus entitled to the same deference as if the state court had entered written findings to support its decision. *See Wright v. Sec. of Dep't of Corr.,* 278 F.3d 1245, 1255 (11 Cir. 2002).

Additionally, under the AEDPA, a state prisoner seeking federal habeas relief cannot raise a federal constitutional claim in federal court unless he first properly raised the issue in the state courts. *See* 28 U.S.C. § 2254(b)[5]; *Picard v. Connor,* 404 U.S. 270, 275 (1971) ("[A] state prisoner must normally exhaust available state judicial remedies before a federal

---

[5]

Pertinent parts of the statute provide:

> (b) (1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that--
> (A) the applicant has exhausted the remedies available in the courts of the State; or
> (B) (I) there is an absence of available State corrective process; or
> (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.
> (2) An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.
> (3) A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement.

28 U.S.C. § 2254(b).

court will entertain his petition for habeas corpus.").  The exhaustion requirement reflects a policy of federal-state comity, as "it would be unseemly in our dual system of government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation." *Picard*, 404 U.S. at 275.  To exhaust state remedies, a petitioner is required to "fairly present" federal claims to the state courts in order to give the State the "opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365-66 (1995) (citing *Picard*, 404 U.S. at 275).   To be given an opportunity to correct alleged violations of a prisoner's federal rights, the State must be alerted that the prisoner is asserting claims under the United States Constitution.  *Id.* at 366.

The doctrine of procedural default was developed as a means of ensuring that federal habeas petitioners first seek relief in accordance with established state procedures. *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001) (citing *Presnell v. Kemp*, 835 F.2d 1567, 1578-79 (11th Cir. 1988)). A state court's rejection of a petitioner's constitutional claim on state procedural grounds will generally preclude any subsequent federal habeas review of that claim.  *Id.* (citing *Harmon v. Barton*, 894 F.2d 1268, 1270 (11th Cir. 1990)). However, a state court's rejection of a federal constitutional claim on procedural grounds will only preclude federal review if the state procedural ruling rests upon "independent and adequate" state ground. *See Coleman v. Thompson*, 501 U.S. 722, 729-30, 115 L. Ed. 2d 640, 111 S. Ct. 2546 (1991); *Harris v. Reed*, 489 U.S. 255, 262, 103 L. Ed. 2d 308, 109 S. Ct. 1038 (1989).

In *Card v. Dugger*, 911 F.2d 1494 (11th Cir. 1990), the Eleventh Circuit established

a three-part test to determine when a state court's procedural ruling constitutes an independent and adequate state rule of decision. First, the last state court rendering a judgment in the case must clearly and expressly state that it is relying on state procedural rules to resolve the federal claim without reaching the merits of that claim. Second, the state court's decision must rest solidly on state law grounds, and may not be intertwined with an interpretation of federal law.  Finally, the state procedural rule must be adequate – it must not be applied in an arbitrary or unprecedented fashion and cannot be "manifestly unfair" in its treatment of the petitioner's federal constitutional claim.  *Id*. at 1516-1517.

III.    <u>ANALYSIS</u>

Prior to a discussion of the four grounds of error raised by Doorbal, I  address the question of whether an evidentiary hearing is necessary in this case.  In federal habeas proceedings, Petitioner has the burden of showing that he is entitled to an evidentiary hearing. 28 U.S.C. §2254(e)(2);[6] *Keeney v. Tamayo-Reyes*, 504U.S. 1, 10 (1992) (before

---

[6]

Pertinent parts of AEDPA provide:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that --
>> (A) the claim relies on--
>>> (I) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable;  or
>>> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. §2254(e)(2).  Moreover, these exceptions apply only to guilt or innocence

a federal habeas petitioner is entitled to an evidentiary hearing he must establish "cause and prejudice" for his failure to present the evidence in state court).   In *Williams v. Taylor*, 529 U.S. 420 (2002), the Supreme Court held that §2254(e)(2) prohibits an evidentiary hearing if the lack of a hearing in state court was due to some lack of diligence on Petitioner's part.  To be diligent, a petition must "at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Id.* at 437.  Such a lack of diligence is evidenced by filing claims based merely on conclusory allegations.  *Smith v. Bowersox*, 311 F.3d 915, 921-22 (8th Cir. 2002).

Under the law of this Circuit, even if § 2254(e)(2) does not bar an evidentiary hearing, a petitioner is still not entitled to an evidentiary hearing if he would not be entitled to relief if the allegations he has made were taken as true.  *Breedlove v. Moore*, 279 F.3d 952, 960 (11th Cir. 2002).  Where, as here, a petition is governed by the AEDPA, a petitioner is required to show that if the facts were true, the state courts' rejection of them would be contrary to or an unreasonable application of clearly established United States Supreme Court precedent.  *Id.* at 961.

During oral argument, Petitioner's counsel advised the Court that despite the lack of evidentiary hearings on the matters raised in the state courts, he believed that the factual matters were sufficiently established in the pleadings to allow me to proceed without an evidentiary hearing.  Petitioner's counsel added that the only matter where unanswered questions remain are as to the issue of when Judge Ferrer became aware that he was going to retire from the bench in order to begin his career as a television personality.  The

---

determinations and not to issues relating to the sentence.  *In re Jones*, 137 F.3d 1271, 1274 (11th Cir. 1998).

time-line regarding the signing of Judge Ferrer's decision to enter into the contract and to retire is related to Ground III of the Petition.  Specifically, Petition argues that Judge Ferrer improperly rushed through the post-conviction proceedings in order to accommodate his schedule, and that his actions, including the denial of a continuance of the post conviction evidentiary hearing, violated Doorbal's due process rights.

As will be discussed in connection with Ground III, Petitioner is not entitled to relief under Ground III regardless of when Judge Ferrer decided to retire from the bench. Therefore, and noting Petitioner's concession that the factual matter is sufficiently established in the pleadings, I conclude that an evidentiary hearing is not appropriate under *Breedlove* and 28 U.S.C. 2254(e)(2).  Having so decided, I now turn to a discussion of the four grounds raised by Doorbal in this case.

**1.    Doorbal was denied due process when Judge Ferrer rejected his motion to disqualify the judge, despite the fact that Doorbal had a well-grounded fear that Judge Ferrer could not be impartial [with respect to the Schiller issues].**

Petitioner first asserts that he is entitled to federal habeas relief because he was denied due process when Judge Ferrer denied Capital Collateral Regional Counsel's (CCRC) motion to disqualify him from presiding over Petitioner's post-conviction proceedings.   CCRC's motion was based on information from an article titled "Pain and Gain" in the January 2000 issue of *The Miami New Times,* which reported that Judge Ferrer testified on behalf of Marc Schiller, a crucial witness at Doorbal's trial,  at Schiller's federal sentencing hearing.   Judge Ferrer denied the motion as untimely and legally insufficient without holding a hearing. Doorbal presented this claim to the Florida Supreme Court in his post-conviction appeal.  The Florida Supreme Court found that although the

motion was timely, Doorbal had not adequately demonstrated a fear of bias or prejudice under Florida Rule of Judicial administration 2.160 and Sate decisional law interpreting the rule.  Specifically, the Florida Supreme Court stated:

> The motion to disqualify filed on March 27, 2003, stated:
>
>> Undersigned counsel filed his Notice of Appearance as Mr. Doorbal's counsel on March 18, 2003. Although undersigned counsel has not received any records on Mr. Doorbal's case as of today's date, preliminary research indicates that subsequent to Mr. Doorbal's conviction and sentence, Mr. Schiller was charged and ultimately pled guilty to felony federal charges. During Mr. Schiller's federal sentencing hearing, Judge Ferrer testified on behalf of Mr. Schiller as a witness.
>
> The basis for this statement was a January 2000 article titled "Pain and Gain" from the Miami New Times, a local periodical.
>
> ***
>
> Fear of bias/prejudice- On the merits of the motion to disqualify, Doorbal contends that Judge Ferrer's testimony on behalf of Schiller during the federal proceedings demonstrated bias against Doorbal. The transcript of the Schiller sentencing hearing reveals that Judge Ferrer testified that Schiller was a crucial witness with regard to the crimes committed against him, and also during consideration of the penalty phase in connection with the Griga/Furton charges. His testimony included the trial description of the abduction, extortion, and attempted murder of Marc Schiller. In response to the questioning, Judge Ferrer expressed his impression from the trial evidence with regard to the ordeal endured by Schiller:
>
>> I'm a firm believer that punishment is only punishment if it's imposed by the government or by the state as a result of the crime committed.
>>
>> ... And an armed robber commits an armed robbery and complains to me that he got shot as a result of the armed robbery by the victim, I generally view it as an occupational hazard.
>>
>> It's not a form of punishment, I don't give him any credit for it towards his sentence. For some reason, I feel this case is different. I can't tell you why. I don't know a legal reason why.
>>
>> I know that we can consider anything at sentencing. This case was

15

a very emotional case to sit through. It still bothers me to some extent. And I know that if things were just black and white, they could have computers do our jobs.

But there's something intangible about this case that makes me feel like what he went through should be given some credit, because I don't think it could have been any worse if he was a prisoner of war.

Doorbal asserted that as a result of this federal trial testimony, he possessed a well-founded fear that Judge Ferrer would not be fair and impartial during these post-conviction proceedings.

This Court reviews a trial court determination on whether a motion for disqualification is legally sufficient de novo. *See Chamberlain v. State*, 881 So.2d 1087, 1097 (Fla. 2004). Under former rule 2.160, a motion to disqualify must demonstrate "that the party fears that he or she will not receive a fair trial or hearing because of specifically described prejudice or bias of the judge." Fla. R. Jud. Admin. 2.160(d)(1) (2004). The facts alleged in a motion to disqualify must demonstrate that the party has a well-grounded fear that he will not receive a fair trial before the judge. *See Livingston v. State*, 441 So.2d 1083, 1087 (Fla. 1983).

We have carefully considered the testimony of Judge Ferrer during the federal court sentencing hearing, and we conclude that it fails to establish a well-grounded fear on the part of Doorbal that he would not receive a fair hearing. In *Waterhouse v. State*, 792 So.2d 1176, 1192 (Fla. 2001), the trial judge issued a much more egregious statement to the Florida Parole and Probation Commission to the effect that "the subject is a dangerous and sick man and that many other women have probably suffered because of him." We rejected the claim that such a statement by a trial court judge provided a basis for the recusal of the trial judge in subsequent proceedings:

[T]he comment to the Commission did not constitute a prejudgment of any pending or future motions that the defendant might file, and was not made outside the official post-sentence investigative process in a manner indicating a predisposed bias against the defendant. Given the facts in this case, the statement to the Commission indicates nothing more than the judge's opinion after having heard evidence relating to two exceedingly cruel and brutal murders of women who were sexually assaulted. The circumstances of these murders, coupled with Waterhouse's own admission that he had a "problem with sex and violence," would lead any reasonable person to conclude that Waterhouse is a "dangerous and sick man."

16

*Id.* at 1195; *see also Rivera v. State*, 717 So.2d 477, 480-81 (Fla. 1998) (finding that the written response by the trial judge to a parole commission inquiry that "I am inalterably opposed to any consideration for Executive Clemency and I believe the sentence of the court should be carried out as soon as possible" was insufficient to disqualify the judge from further presiding over the case); *cf. Suarez v. Dugger*, 527 So.2d 190, 192 n. 1 (Fla. 1988) (trial court erred when it denied a motion to disqualify where a newspaper article reported that the judge was pleased with the decision of the governor to sign a death warrant for the defendant and that he did not "believe that [Suarez's] case merits postponements").

The testimony before to the federal sentencing court here did not specifically reference Doorbal at any point. We conclude that nothing in the testimony constituted a prejudgment of any pending or future motions that Doorbal might file in Judge Ferrer's court, nor were any statements by Judge Ferrer indicative of a predisposed bias against Doorbal. *Cf. Suarez*, 527 So.2d at 192 n. 1. Instead, Judge Ferrer merely responded to the impact of the evidence that was presented during the murder trial with regard to the brutal abduction, torture, and attempted murder that Schiller suffered over a period of almost a month. We conclude that the facts of this case would lead any reasonable person to conclude that the experience of Schiller was traumatic and not entirely unlike that of a prisoner of war.

Moreover, our decision is additionally guided by the fact that every judge who is vested with the responsibility to preside over post-conviction proceedings of a capital defendant after he or she has presided over the original trial will have issued a detailed sentencing order that, under Florida law, requires that details of the facts of the crimes committed by the defendant be set forth and weighed by both the judge and jury. Indeed, in the present case, when Judge Ferrer found the existence of the prior violent felony aggravator, he provided extensive facts in the sentencing order, as he was required to do, with regard to the physical and psychological torture endured by Schiller during his abduction. A number of the statements that Judge Ferrer included in the state court final sentencing order were simply repeated during the federal sentencing hearing. If a statement or characterization by a trial judge with regard to the facts of a capital case was sufficient to require the disqualification of that judge, then any and all judges who preside over capital trials could never preside over the post-conviction proceedings for that same defendant because statements in the sentencing order would create a fear of bias on behalf of the defendant and a legal basis for disqualification. We decline to mandate such widespread disqualification of judges in capital cases.

In light of the foregoing, we conclude that the trial court properly denied the

17

motion to disqualify as legally insufficient. *See Waterhouse*, 792 So.2d at 1195. Nonetheless, we do emphasize that we do not encourage trial judges to testify on behalf of a victim from one of their prior criminal cases with regard to the ordeal of the victim in that prior case. Judges in Florida are required to maintain an appearance of impartiality. *See* Fla. Code Jud. Conduct, Canon 3. A judge may be unnecessarily forced to walk a fine line when he testifies with regard to how the evidence of the suffering of a victim in a case impacted him.

*Doorbal III* at 475-78.

In his federal Petition, Doorbal argues that the application of Florida's rule and decisional law to his claim was in error since the Florida Supreme Court should have reviewed the claim under federal constitutional law as announced by the Supreme Court. The State argues that to the extent that Petitioner is seeking federal habeas relief based on a claim that it was a denial of due process for Judge Ferrer to preside over his post-conviction proceedings, the claim should be rejected because it is not cognizable. Moreover, on the merits, Petitioner is still entitled to no relief because the Florida Supreme Court addressed the claim of whether Judge Ferrer's testimony showed that he was biased, and Petitioner has not shown that the rejection of the claim was contrary to, or an unreasonable application of clearly established United States Supreme Court precedent.[7] In his Reply, Doorbal argues that he was deprived of fair and impartial post-conviction

---

[7] The State also argues that to the extent that Petitioner is attempting to assert that Judge Ferrer's participation in his trial entitles him to federal habeas relief, the claim should still be denied because it is unexhausted, procedurally barred and without merit.  Specifically, since the issue of whether Judge Ferrer's post-trial testimony on behalf of Mr. Schiller showed that Petitioner was entitled to a new trial was not fairly presented in state court, it is not exhausted; and that to the extent that Petitioner may assert that cause for his default of any claim that Judge Ferrer's testimony showed he was biased is based on a claim of ineffective assistance of counsel, Petitioner is still entitled to no relief.  Petitioner has not made either of these claims in his Petition or his Reply, and I need not discuss the merits of claims not raised by Doorbal.

18

proceedings; and that while Judge Ferrer's alleged bias may not be a stand-alone basis for federal habeas relief, it profoundly impacts the degree of deference in this Court's review because it deprives the state court findings of their presumption of correctness.

Pursuant to 28 U.S.C. §2254(a), a federal habeas petition by a state inmate is cognizable "only on the grounds that he is in custody in violation of the Constitution or laws or treaties of the United States."   *Id.*   The Eleventh Circuit has held that "where a petitioner's claim goes to issues unrelated to the cause of petitioner's detention, that claim does not state a basis for habeas relief."   *Quince v. Crosby*, 360 F.3d 1259, 1261 (11th Cir. 2004). Claims asserting errors in the manner in which the state court conducted post-conviction proceedings are considered claims that are unrelated to the cause of the petitioner's detention.   *Id.* at 1261; *Spradley v. Dugger*, 825 F.2d 1566, 1568 (11th Cir. 1987) (holding that while habeas relief is available to address defects in a criminal defendant's conviction and sentence, an alleged defect in a collateral proceeding does not state a basis for habeas relief); *Nichols v. Scott*, 69 F.3d 1255, 1275 (5th Cir. 1995) ("An attack on a state habeas proceeding does not entitle the petitioner to habeas relief in respect to his conviction, as it is an attack on a proceeding collateral to the detention and not the detention itself.") (internal quotes omitted).

Similar to this case, the petitioner in *Quince* asserted that he was entitled to federal habeas relief because the judge presiding over his state post-conviction proceedings had denied a motion for disqualification, which was based on the fact that the judge had been a colleague of trial counsel and might have performed administrative functions regarding the processing of the petitioner's direct appeal. *Quince*, 360 F.3d at 1261.  The Eleventh

Circuit affirmed the district court's denial of the claim because it did not present a cognizable claim for federal habeas relief. *Id.* at 1261-62. However, the court noted that petitioner could "have argued that there was a deficiency which rendered the state court proceedings not full and fair," and that "[s]uch a deficiency might deprive the state of the presumption of correctness with respect to the findings of [the state judge]." *Id.* (citing *Thompson v. Keohane*, 516 U.S. 99, 108-09, 116 S. Ct. 457, 463-64, 133 L. Ed. 2d 383 (1995); *Hardwick v. Crosby*, 320 F.3d 1127, 1158 (11th Cir. 2003)). An argument that post-conviction proceedings were not full and fair, "is distinguishable from directly seeking habeas relief based on [a judge's] failure to recuse himself; it only affects the presumption to which findings of fact are entitled on habeas review, thus only indirectly affecting [a] Court's analysis of [a petitioner's] other habeas claims." *Id.* at n. 3.

As was the case in *Quince*, Judge Ferrer's denial of Doorbal's motion requesting that he disqualify himself from the *post-conviction proceedings* is not cognizable and is therefore denied. *Cf. Quince* 360 F.3d at 1261-62 (affirming district court's denial of habeas relief based on state court judge's refusal to recuse himself from the Rule 3.850 hearing, explaining "while habeas relief is available to address defects in a criminal defendant's conviction and sentence, an alleged defect in a collateral proceeding does not state a basis for habeas relief.").

Petitioner's argument that the state court is deprived of a presumption of correctness as to its factual findings because Doorbal did not receive fair and impartial post-conviction proceedings because Judge Ferrer was prejudiced against him is also without merit. The Florida Supreme Court found that Judge Ferrer's testimony did not

evidence bias against Petitioner, as it did not refer to Petitioner at all and closely resembled his findings regarding the prior violent felony aggravator in his sentencing order.  While the Florida Supreme Court did not mention federal precedent in making its determination, the Eleventh Circuit has held that a state court does not need to discuss a claim or cite to federal case law for the AEDPA standard of review to apply.  *Isaacs v. Head*, 300 F.3d 1232, 1258-60 (11th Cir. 2002) (standard applies even if federal authorities are not cited); *Wright v. Moore*, 278 F.3d 1245, 1253-56 (11th Cir. 2002) (standard applies even if state court decision did not discuss the issue).  Thus, "the only question that matters" in this case is "whether a state court decision is contrary to, or involved an unreasonable application of, clearly established Federal law." *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003).

The Supreme Court has held that "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555 (U.S. 1994).  The Supreme Court further explained that

> judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They may do so if they reveal an opinion that derives from an extrajudicial source; and they will do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible. An example of the latter (and perhaps of the former as well) is the statement that was alleged to have been made by the District Judge in *Berger v. United States*, 255 U.S. 22, 65 L. Ed. 481, 41 S. Ct. 230 (1921), a World War I espionage case against German-American defendants: "One must have a very judicial mind, indeed, not [to be] prejudiced against the German Americans" because their "hearts are reeking with disloyalty." *Id.*, at 28 (internal quotation marks omitted). Not establishing

21

bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display.

*Id.* at 555-56; *see also  Wiley v. Wainwright*, 793 F.2d 1190, 1193 (11th Cir. 1986) ("As a general rule, bias or prejudice sufficient to [**5]   disqualify a judge must stem from extrajudicial sources... A trial judge's comments on lack of evidence does not constitute such pervasive bias.").

The Florida Supreme Court found that a number of Judge Ferrer's statements made at Schiller's sentencing hearing were merely a repetition of statements included in the state court's final sentencing order.  Finding bias on this basis would require the disqualification of any and all judges over the post-conviction proceedings of defendants whose capital trials the same judge presided over.  Federal law does not mandate this requirement. Here, Judge Ferrer's comments did not derive from an extrajudicial source, rather, they were conclusions from the evidence presented at trial.  Mor importantly, the statements were about Schiller's experience, not about Doorbal. For these reasons, the Florida Supreme Court's ruling upholding Judge Ferrer's decision not to recuse himself from the post-conviction proceedings, which was based on a finding "that nothing in the testimony constituted a prejudgment of any pending or future motions that Doorbal might file in Judge Ferrer's court, nor were any statements by Judge Ferrer indicative of a predisposed bias against Doorbal.... because Judge Ferrer merely responded to the impact of the evidence that was presented during the murder trial with regard to the brutal abduction, torture, and attempted murder that Schiller suffered over a period of almost a month," is not contrary to clearly established Federal law.  Since Doorbal has failed to meet the AEDPA standard,

federal habeas relief is denied on this ground.  Moreover, since Doorbal has failed to established bias on Judge Ferrer's part, it cannot be said that Doorbal did not receive fair and impartial post-conviction proceedings depriving the State of a presumption of correctness as to it factual findings in this habeas petition.

> **2.      The State called a crucial witness at trial, both during the guilt phase and during the penalty phase, who lied about his own criminal conduct, but the State permitted this false testimony to stand uncorrected**

In Ground II, Petitioner argues that he is entitled to federal habeas relief because the State knowingly presented false testimony from victim Marc Schiller when he denied that he was guilty of medicare fraud at Petitioner's trial in violation of *Giglio v. United States*, 405 U.S. 150 (1972).[8] Specifically, Doorbal asserts that the State knowingly presented false testimony from Schiller when he denied that he was guilty of medicare fraud at Petitioner's trial.

In his post-conviction appeal, Petitioner combined the denial of a motion to depose the prosecutors and the denial of an evidentiary hearing regarding the alleged *Giglio* violation.  In his state habeas petition, Petitioner raised two separate claims, asserting that appellate counsel had been ineffective for failing to raise issues regarding the alleged *Brady* and *Giglio* violations.  The Florida Supreme Court affirmed the denial of the claims related to the post-conviction motion and denied the claims in the state habeas petition:

> To establish a *Brady* violation, a defendant has the burden to show (1) that favorable evidence-either exculpatory or impeaching, (2) was willfully or

---

[8]

Although Doorbal has previously raised claims of alleged violations of *Brady* and *Giglio* to the state courts*,* only the *Giglio* claim has been presented in his federal habeas petition.

inadvertently suppressed by the State, and (3) because the evidence was material, the defendant was prejudiced. *See Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); *see also Way v. State*, 760 So.2d 903, 910 (Fla. 2000). A Giglio violation is demonstrated when (1) the prosecutor presented or failed to correct false testimony; (2) the prosecutor knew the testimony was false; and (3) the false evidence was material. *See Guzman v. State*, 941 So.2d 1045, 1050 (Fla. 2006). We conclude that Doorbal has failed to establish either a *Brady* or a *Giglio* violation and, therefore, the trial court did not err when it summarily denied this claim without an evidentiary hearing.

First, Doorbal has failed to demonstrate that the State suppressed or withheld impeachment evidence. As noted by the trial court, allegations that Schiller was involved in Medicare fraud with Delgado were spread throughout the trial. During an October 23, 1997, hearing at which the trial judge addressed what questions Delgado would be compelled to answer in his deposition, counsel for a codefendant stated "[a]s soon as [Delgado] is done testifying he will be indicted and Mr. Schiller will be indicted and there's no one in this courtroom that thinks any different. Once these trials are over they're federal defendants." During the same hearing, ASA Levine asserted that the codefendants "know there is some kind of investigation. They're all hoping to find out where Schiller fits in," and referred to Schiller as the "alleged kingpin." Finally, during Doorbal's trial, Delgado testified on cross-examination with regard to Schiller's involvement in the alleged Medicare fraud scheme. We, as did the trial court, reject the assertion that Doorbal is entitled to relief on a contention that he did not know that Schiller was allegedly involved in improper Medicare activity or was being investigated by the federal government for Medicare fraud when the record is replete with these allegations in open proceedings in which Doorbal participated. *See Maharaj v. State*, 778 So.2d 944, 954 (Fla. 2000) ("[A] *Brady* claim cannot stand if a defendant knew of the evidence allegedly withheld or had possession of it, simply because the evidence cannot then be found to have been withheld from the defendant").

Doorbal has completely failed to demonstrate that the State knew Schiller offered false testimony. As the record reveals, everyone (including the codefendants and the trial court) suspected that Schiller engaged in Medicare fraud and that the federal government had Schiller under investigation. However, Schiller was not indicted for Medicare fraud, nor did he plead guilty to Medicare fraud, until after Doorbal was convicted. In the instant proceedings, Doorbal has failed to provide any evidence that the State possessed evidence that Schiller was guilty of Medicare fraud at the time of the trial, and then allowed him to testify to the contrary. Absent evidence to demonstrate that the State unquestionably had evidence and knew that Schiller was guilty at the time that he testified, we conclude that

24

Doorbal has failed to demonstrate that a *Giglio* violation occurred. *See Rodriguez v. State*, 919 So.2d 1252, 1270 (Fla. 2005) (finding no *Giglio* violation where the defendant had not shown "that the prosecutor had any knowledge of allegedly false testimony").

Finally, even if the State withheld evidence or knew that Schiller testified falsely (which it did not), Doorbal cannot demonstrate prejudice under *Brady* or *Giglio*. Under *Brady*, nondisclosure of impeachment evidence is material if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. *See Ventura v. State*, 794 So.2d 553, 563 (Fla. 2001). Under *Giglio*, false testimony is material if there is a reasonable probability that the false evidence affected the judgment of the jury. *See id.* Doorbal sought to introduce evidence of Schiller's Medicare fraud in an attempt to demonstrate that Schiller was a dishonest witness who should not be believed by the jury. Nonetheless, even if Doorbal had been allowed to impeach Schiller with this testimony, we conclude that neither of the above standards for prejudice would have been satisfied. *Id.*

First, during trial, Delgado impeached the testimony of Schiller on this specific issue. Second, the testimony of Schiller with regard to his abduction and kidnaping was corroborated by Delgado, who provided a detailed explanation of the plot to kidnap Schiller and extort his assets. Delgado admitted that Schiller was held in a warehouse that Delgado leased, and that during the kidnaping Delgado had the responsibility to remain at the warehouse to watch Schiller. Delgado testified that during Schiller's kidnaping, Doorbal beat Schiller, slapped him, and burned his skin with cigarettes to obtain information about his assets.

Delgado testified that when the codefendants decided to kill Schiller, Lugo, Doorbal, and two others placed Schiller in a car and set it on fire. According to Delgado, Lugo explained that after the fire erupted, Schiller managed to escape the burning vehicle. He then admitted to Delgado that they ran Schiller over twice with his (Lugo's) car. When Delgado informed Lugo that he did not believe Schiller would have died from his injuries, Lugo began to phone hospitals to see if Schiller had been admitted. During the trial, a photograph of Schiller's scorched vehicle was introduced into evidence. Finally, as noted in the opinion of this Court on direct appeal, "[w]hen warrants were executed at Doorbal's apartment, police found the following: computer equipment and jewelry belonging to Schiller, receipts for purchases on Schiller's credit card, a receipt relating to the changing of locks at Schiller's home, and handcuffs." *Doorbal*, 837 So.2d at 947 n. 12.

Given the significant evidence presented at trial that corroborated the ordeal experienced by Schiller at the hands of Doorbal and Lugo, we conclude that

25

even if additional evidence of Schiller's involvement in improper Medicare activity had been presented to the jury, there is no reasonable probability that the outcome of this trial would have been different. *See LeCroy v. Dugger*, 727 So.2d 236, 239 (Fla. 1998) (no *Brady* violation occurred where the evidence presented at trial was so overwhelming that there was no reasonable probability that outcome would have been different had the State disclosed the evidence). Similarly, this evidence, and the fact that Delgado did present evidence which called the credibility of Schiller into question, demonstrates that there is no reasonable probability that any false testimony by Schiller affected the judgment of the jury. [FN10]

In light of the foregoing, we conclude that no *Brady* or *Giglio* violation occurred during the trial proceedings. Therefore, we hold that the trial court did not abuse its discretion when it denied the motion to depose the ASAs.

**\*\*\*\*\*\*\*\*\*\***

[FN10] Doorbal seems to assert that if Schiller had been forced to admit Medicare guilt, the jurors would have been more likely to believe that he had fabricated his testimony of his kidnaping, extortion, and attempted murder. Doorbal also appears to assert that if Schiller was revealed to be a criminal himself, the jurors would have been less likely to recommend the death penalty for the Griga/Furton counts. Doorbal implies that if an individual engages in illegal practices, the abduction, torture, and attempted murder of that individual is not as egregious as if the victim is a law-abiding citizen. This Court disagrees with both assertions.

*Doorbal III* at 480-82.

Under federal law, the prosecution has a duty to correct statements of a witness it knows are false. *See United States v. Bagley*, 473 U.S. 667, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985); *Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972); *United States v. Rivera Pedin*, 861 F.2d 1522, 1529 (11th Cir. 1988). The thrust of *Giglio* and its progeny has been to ensure that the jury know the facts that might motivate a witness in giving testimony, and the prosecutor not fraudulently conceal such facts from the jury." *Ventura v. AG,* 419 F.3d 1269, 1282 (11th Cir. 2005).

To establish a *Giglio* violation, a defendant must demonstrate that the testimony

26

was false, that the state knew the testimony was false, and that the false testimony was material, i.e., there was a reasonable likelihood that the false testimony could have affected the judgment of the jury. *DeMarco v. United States*, 928 F.2d 1074 (11th Cir. 1991).  In other words, to prevail on his *Giglio* claim, Doorbal "must establish that the prosecutor knowingly used perjured testimony, or failed to correct what he subsequently learned was false testimony, and that the falsehood was material.*" Maharaj v. Sec'y for the Dep't of Corr.*, 432 F.3d 1292, 1312 (11th Cir. 2005) (citing *Tompkins v. Moore*, 193 F.3d 1327, 1339 (11th Cir. 1999)).   The false testimony is  material when it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *United States v. Dickerson*, 248 F.3d 1036, 1042 (11th Cir. 2001) (quoting *Strickler v. Greene*, 527 U.S. 263, 290 (1999)).

Under the law of this Circuit, "[t]here is no violation of due process resulting from prosecutorial non-disclosure of false testimony if defense counsel is aware of it and fails to object." *Routley v. Singletary*, 33 F.3d 1279, 1286 (11th Cir. 1994) (citing *United States v. Meinster*, 619 F.2d 1041 (4th Cir. 1980); *United States v. Iverson*, 648 F.2d 737 (D.C. Cir. 1981); *Ross v. Heyne*, 638 F.2d 979 (7th Cir. 1980)). Also, a *Giglio* violation is not material where evidence is presented contradicting the allegedly false statement.  *See, e.g., United States v. Dickerson,* 248 F.3d 1036, 1042 (11th Cir. 2001).  Neither is the violation material where there was overwhelming evidence corroborating the testimony at trial.  *See, e.g.,Ventura v. AG,* 419 F.3d 1269, 1286 (11th Cir. 2005) (The state court's "conclusion that there was no reasonable likelihood that the false testimony presented at ... trial could have affected the judgment of the jury was not objectively unreasonable in

27

light of the extensive and powerful corroborating evidence introduced and the substantial impeachment of [the witness] at trial.").

Without deciding whether the Florida Supreme Court applied the correct standard to the question of whether the State knew that Schiller's testimony was false, Doorbal's petition must be denied because he cannot demonstrate prejudice under *Giglio*.  The record shows that the Defendants were aware of Schiller's involvement in medicare fraud.  For example, during pretrial depositions of Schiller and co-conspirator Jorge Delgado, the defense attempted to question them about their involvement in medicare fraud, but they refused to answer based on the Fifth Amendment.  Subsequently, during the hearing on the defense's motion seeking to compel Delgado to answer questions about medicare fraud,  Delgado averred that his assertion of his Fifth Amendment privilege was based on the fact that the medicare fraud was the subject of an existing federal investigation.  The State acknowledged that Delgado was under an investigation for federal crimes and that it knew of the investigation.  In support of its motion, the defense argued that questions about medicare fraud were relevant because "[a]s soon as [Delgado] is done testify he will be indicted and Mr. Schiller will be indicted and there's no one in this courtroom that thinks any different.  Once these trials are over they're federal defendants."  (App. M-Vol. 29 at 1697).  In response, the State acknowledged that Schiller was allegedly the kingpin of the medicare fraud scheme and everyone knew it.

At trial, Schiller admitted that he had owned medical supply companies that billed medicare, but denied that he knowingly engaged in a fraudulent medical supply business or engaged in illegal business with Delgado.  On the other hand, Delgado testified that the medical supply business was committing medicare, that Schiller was involved in medicare

fraud and that he discussed the illegality of the business with Schiller.  While the State did not correct Schiller's allegedly false statement, during its closing argument, the State argued that Schiller's alleged involvement in medicare fraud was irrelevant.[9]  In addition, Schiller's testimony was corroborated by Delgado and by physical evidence.

The Florida Supreme Court correctly identified *Giglio* as providing the standard for the adjudication of the claim; it further concluded that the alleged false testimony was not material because Doorbal was aware of the medicare investigation; the prosecution solicited testimony from Delgado as to Schiller's involvement in the medicare fraud thereby presenting evidence to the jury to impeach Schiller; and, there was no reasonable probability that the false evidence affected the judgment of the jury since Delgado and physical evidence corroborated Schiller's testimony.  Under the facts of this case and the applicable federal law, it cannot be found that the decision of the Florida Supreme Court

---

[9]

Specifically, in addressing the jury, the State argued:

> Oh, I know the defense attorneys are going to get up here and tell you.  Marc Schiller is a bad guy because he committed Medicare fraud.  Well, you know what?  I don't know whether he committed Medicare fraud.  And you know what?  That's not your concern, because he's not on trial here today.  Don't make Marc Schiller the defendant in this case.  He is the victim.  You don't have to like him.

> Remember in voir dire we talked about if somebody's a drug dealer, do they still get to have crime put upon them, do they still get to be killed if they were dealing drugs on the street?  And each and every one of you were marked because you said you could not consider that as a legal excuse to murder.

> Well, you know what?  If you think March Schiller committed Medicare fraud, maybe you want to talk to the F.B.I. about it, but that's not an element in this case.

(App. M-Vol. 91 at 13064-65).

29

was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.  For this reason, Doorbal's second ground in support of his petition for federal habeas relief is denied.

> **3.      Doorbal was denied due process of law when Judge Ferrer refused a good cause motion for continuance of an evidentiary hearing due to Judge Ferrer's decision to leave the bench and begin a television career.**

Petitioner next asserts that he is entitled to federal habeas relief because the post-conviction court denied his motion to continue a hearing on Doorbal's psychological evaluations due to Judge Ferrer's decision to leave the bench and begin a television career.  According to Doorbal, the unfavorable ruling on his motion for continuance resulted in a denial of his due process rights.  The State responds that this claim concerns the conduct of the state post-conviction proceedings and is therefore not cognizable in a federal habeas petition.  In his Reply, Doorbal recharacterized his claim as one based on *Ake v. Oklahoma*, 470 U.S. 68 (1985), arguing that he did not receive a fair adjudication because he was denied access to psychiatric assistance.  Specifically, he argues that after Judge Ferrer recognized Doorbal's right to access to mental health professionals for evaluation, Judge Ferrer denied the claim without a hearing in order to accommodate his own schedule for leaving the bench.  The State has filed a motion to strike the *Ake* claim, arguing that Doorbal cannot amend his claims through a reply, and that any amendments to his petition would be futile since this new claim is untimely and fails on the merits.

The claim, as presented to the state court and in Doorbal's "Preliminary Memorandum in Support of Petition for Writ of Habeas Corpus" [DE 7] addressed a conceived error in the conduct of the state court post-conviction proceedings.  In this

Circuit, claims concerning the manner in which a state court handled a post-conviction proceeding are not cognizable claims for federal habeas relief. Similarly, a state court's failure to hold an evidentiary hearing on a petitioner's 3.850 motion is not a basis for federal habeas relief. *Anderson v. Sec'y for the Dep't of Corr.*, 462 F.3d 1319, 1330 (11th Cir. 2006) (denying the petitioner's claims the state post-conviction court violated his constitutional rights by failing to conduct an evidentiary hearing with respect to the State's failure to establish the corpus delicti of murder and with respect to ineffective assistance of counsel for failure to object to the penalty phase jury instructions); *Spradley v. Dugger*, 825 F.2d 1566 (11th Cir. 1987) (claim that state court erred in post-conviction proceeding by denying motion without holding an evidentiary hearing or attaching portions of the record). The issue thus become whether Doorbal should be giving grant to amend his petition to add a claim based on *Ake.* As discussed below, because amendment would be futile as the claim fails on the merits, I decline to do so.

In *Ake,* the Supreme Court held that "when a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the Constitution requires that a State provide access to a psychiatrist's assistance on this issue if the defendant cannot otherwise afford one." *Conklin v. Schofield*, 366 F.3d 1191, 1206 (11th Cir. 2004) (quoting *Ake*, 470 U.S. at 74). The reasoning behind the *Ake* rule is that "when a State brings its judicial power to bear on an indigent defendant in a criminal proceeding, it must take steps to assure that the defendant has a fair opportunity to present his defense." *Id.* (quoting *Ake,* 470 U.S. at 76). The *Ake* Court emphasized that "the entitlement to psychiatric assistance exists only in cases where a defendant's mental

31

condition is 'seriously in question' and that the State's obligation d[oes] not go beyond providing the defense with the assistance of one competent psychiatric expert. Further, ... the states c[an] provide such assistance as they s[ee] fit and ... a defendant's constitutional right d[oes] not include the authority 'to choose a psychiatrist of his personal liking or to receive funds to hire his own.'"  *Grayson v. Thompson*, 257 F.3d 1194, 1231 (11th Cir. 2001) (citing *Ake*, 470 U.S. at 82-83).  Thus, pursuant to *Ake*, the Constitution guarantees indigent criminal defendants access to one psychiatrist, paid for by the Government, if the defendants' sanity is a defense at trial.  Further, an *Ake* claim must be based on a ruling by a state court denying a criminal defendant such assistance at the time of trial.  *See Clisby v. Jones*, 960 F.2d 925 (11th Cir. 1992).

The Eleventh Circuit utilizes a two-step analysis to review *Ake* claims.  *Id.* at 930.  First, the court examines the information before the trial court when it is alleged to have deprived the defendant of due process. *Id.* (citing *Thomas v. Jones*, 891 F.2d 1500, 1506 (11th Cir.1989), cert. denied, 495 U.S. 953, 110 S. Ct. 2220, 109 L. Ed. 2d 545 (1990); *Messer v. Kemp*, 831 F.2d 946, 960 (11th Cir.1987) (en banc), cert. denied sub nom. *Messer v. Zant*, 485 U.S. 1029, 108 S. Ct. 1586, 99 L. Ed. 2d 902 (1988); *Moore v. Kemp*, 809 F.2d 702, 710-13 (11th Cir. 1987) (en banc), cert. denied, 481 U.S. 1054, 107 S. Ct. 2192, 95 L. Ed. 2d 847 (1987)).  Second, the court determines wether that information should have led the trial court to conclude that the defendant would probably not receive a fair trial.  *Id.* (citing *Thomas*, 891 F.2d at 1506; *Messer*, 831 F.2d at 960; *Moore*, 809 F.2d at 710).

Assuming for purposes of discussion that Doorbal was able to amend its petition to

32

include the *Ake* claim raised in his Reply, habeas relief would still be denied because the claim is unexhausted and procedurally barred.   In his petition for writ of habeas corpus to the Florida Supreme Court, Petitioner raised a claim for ineffective assistance of appellate counsel for failing to raise or discuss the trial court's error in refusing to approve additional funds for defense experts in violation of *Ake*. (*See* Petition, Claim IX, p. 40-41).   As to this claim, the Florida Supreme Court stated:

> Denial of Funds for Defense Experts
>
> Doorbal next asserts that appellate counsel was ineffective because counsel failed to challenge on direct appeal the failure of the trial court to authorize large sums of money to pay a psychiatric expert that was allegedly necessary for the defense of Doorbal. The refusal to approve funds for the payment of experts for an indigent defendant is reviewed under an abuse of discretion standard. *See San Martin v. State*, 705 So. 2d 1337, 1347 (Fla. 1997). This Court has applied a two-part test to evaluate whether a trial court has abused its discretion: (1) whether the defendant established a particularized showing of need; and (2) whether the defendant was prejudiced by the denial of the motion. *See id.*
>
> We reject this claim as meritless because Doorbal cannot demonstrate that he was prejudiced by the denial of additional funds for the expert. The record in this case reveals that after Doorbal was sentenced to death, trial counsel submitted a final invoice  to the trial court stating that, thus far, it had authorized the payment of $ 4000 to the expert, but an additional $ 2,450.46 was needed to pay the expert in full. On October 29, 1998, the trial court held a hearing on this motion and explained to counsel that all expert funds must be authorized in advance:
>
> > COURT: Did I ever approve $ 2,450.46?
> >
> > COUNSEL: You have not approved that yet, and that is my motion to have you approve that.
> >
> > COURT: Okay. And my problem with that is that you guys have to seek that in advance. You can't, like, let your expert do whatever he wants, and then, submit a bill, and by the way, he has to be paid this money, too. The trial court ultimately ordered that the expert be paid the $ 4000 that the trial court previously authorized, but denied the request for the $ 2,450.46 that was not approved in advance.

33

The record indicates that the expert did not restrict his mental health evaluation based upon a denial of additional expert funds. Instead, it appears that the expert proceeded to incur fees to complete his evaluation without obtaining prior authorization from the Court, and then sought   payment for his bill in excess of $ 4000 after Doorbal was sentenced. Doorbal  fails to assert and cannot establish that the expert did not perform critical evaluations or investigation due to the denial of additional funds by the trial court. [FN 16]. Therefore, there was no prejudice from the denial of the $ 2,450.46 in additional fees when that denial occurred after the expert had already completed the mental health evaluation (and incurred the fees) and had ceased working with Doorbal.

The trial court did not abuse its discretion when it denied the payment of additional fees to the expert. [FN 17] Since this issue is without merit, appellate counsel was not ineffective for failing to raise it on direct appeal. See Lawrence, 831 So. 2d at 135.

*********

[FN 16]   Moreover, Doorbal fails to allege in the habeas petition what evaluations the expert failed to perform due to the denial of funds, or how Doorbal was prejudiced by the expert's alleged failure to perform these evaluations. Doorbal's only assertion in this claim is that "[a]n uncompensated expert labors under something of a financial conflict likely to sour the defense's relationship with its expert." We question whether this claim is even sufficiently pled.

[FN 17] There is a possibility that the expert was actually paid the additional $ 2,450.46 in fees. Despite the trial judge's announcement that he would not approve the fees, the record contains a signed order authorizing the payment of the additional fees to the expert.

*Doorbal III,* 983 So. 2d at 496-497.  In his appeal from denial of his 3.850 motion, Doorbal argued that the trial court erred when it denied a good cause motion for continuance to prepare for an evidentiary hearing.  (*See* Initial Brief of Appellant, Issue V, p. 93).  In this claim, Doorbal argued that "Doorbal's *post-conviction* mental health experts reported to the trial Court that they were unable to complete their review of the relevant records and provide an expert opinion with any certainty on or before the date of Doorbal's scheduled evidentiary hearing." (*Id.*).  The Florida Supreme Court denied the claim, and stated:

Doorbal next contends that the trial court erroneously denied his motion for a continuance of the postconviction proceedings. The postconviction mental health experts retained to evaluate Doorbal had reported to the trial court that they would not be able to complete a review and prepare expert opinions on or before the date of the evidentiary hearing. In light of this fact, Doorbal asserts that the trial court should have continued the proceedings so that the experts could complete their evaluations.

With regard to motions for continuance, this Court has stated:

> A court's ruling on a motion for continuance will only be reversed when an abuse of discretion is shown. An abuse of discretion is generally not found unless the court's ruling on the continuance results in undue prejudice to the defendant. This general rule is true even in death penalty cases. While death penalty cases command our closest scrutiny, it is still the obligation of an appellate court to review with caution the exercise of experienced discretion by a trial judge in matters such as a motion for a continuance.

*Hernandez-Alberto v. State*, 889 So. 2d 721, 730 (Fla. 2004) (citations omitted) (quoting *Israel v. State*, 837 So. 2d 381, 388 (Fla. 2002); *Cooper v. State*, 336 So. 2d 1133, 1138 (Fla. 1976)). We have held that it was not an abuse of discretion for a trial court to deny a motion for continuance of a postconviction evidentiary hearing where counsel filed a motion to depose two witnesses thirteen days before the evidentiary hearing. *See Scott v. State*, 717 So. 2d 908, 912 (Fla. 1998). We explained:

> The decision of this Court was issued March 16, 1995, and Scott knew from that time that Coffin's and Dixon's statements would be in issue during the hearing. Scott, however, did little to secure the testimony of these witnesses until the eve of the evidentiary hearing and used this as a basis for seeking a delay. We find no abuse of discretion in denying the motion for a continuance at that late date.

*Id.* The State contends that denial of the requests for continuance of the evidentiary hearing by Doorbal did not constitute an abuse of discretion because the requests were necessitated by the delays of counsel. To evaluate whether counsel for Doorbal engaged in dilatory tactics, we present a timeline of the proceedings in this case.

Timeline

The actions that counsel took prior to the Huff hearing are not well

35

documented in the record on appeal of the postconviction proceedings. An invoice for attorney expenses dated April 28, 2004, indicates that counsel for Doorbal agreed to accept the appointment on March 18, 2004. According to the invoice, between the dates of March 18 and April 2, counsel interviewed Doorbal, read the opinion on direct appeal, met with CCRC counsel, met with her investigator and a paralegal, and participated in two court conferences. On June 1, 2004, counsel filed motions seeking the release of records from the Records Repository and the Office of the State Attorney. On June 15, 2004, counsel filed the 3.851 motion to vacate. That same day, counsel also filed the motion to depose the assistant state attorneys. According to a letter from the Department of Financial Services, between June 16 and October 25, 2004, counsel billed 494.4 hours for representation of Doorbal. The majority of these hours were dedicated to the following tasks: the review of public records (240 hours), research of case law and facts, as well as the preparation of a response to the State's opposition to the motion (100 hours), and review of the notes and files of trial counsel (100 hours).

During the Huff hearing held on November 9, 2004, the trial court granted Doorbal an evidentiary hearing on only one of his claims. At that time, counsel for Doorbal moved for a continuance. When the trial court suggested that a thirty-day time period was sufficient for the mental health experts to complete their evaluations, counsel objected and asserted that thirty days was not enough time because "these experts deserve the opportunity to go through some of the documents that I gave them. This is a massive documentary case." When counsel requested between sixty and ninety days to complete testing, the trial court granted Doorbal sixty days, but indicated that there would be no further extensions. The trial court urged that counsel stress to the experts the importance of completing the evaluations in a timely manner, and further informed counsel that if the retained experts could not evaluate Doorbal within the time constraints, she should retain others who could. The trial court then ordered that all mental health reports be provided to the State by January 10, 2005. The trial court then scheduled the evidentiary hearing for February 14, 2005. During a November 16, 2004, hearing, counsel requested that Doorbal be transported to Miami-Dade County rather than requiring the experts to travel to Florida State Prison to evaluate him. The trial court instructed the parties that the matter would have to be scheduled for a hearing at which Florida Department of Corrections officials could appear.

On December 21, 2004, counsel for Doorbal requested a stay of the proceedings in light of the fact that she had not been paid for months. The trial court advised counsel that he would do everything possible to ensure that she received payment, but he would not stay the case. The trial court then stated to counsel:

[W]hen you took this case I remember having a discussion with you that there is [sic] not going to be any more delays on this case. You recognized when you stepped into this case at that point I was not going to extend any guidelines [sic] and you explained that to Mr. Doorbal. And the answer was yes, yes, yes, I will work with you as much as I can.

At that time, counsel asserted that the experts still had not seen Doorbal because she had not been able to provide the records to them. Counsel also explained that she would prefer for the experts to review the records before they commenced their evaluations of Doorbal. The trial court refused to delay the evidentiary hearing. During a subsequent hearing on December 23, 2004, at the request of counsel, the trial court ordered that Doorbal be transported to Miami-Dade County for evaluation by mental health experts.

On January 10, 2005, the date that the trial court ordered the evaluations to be completed, counsel for Doorbal reported:

Our experts have already been in to see him to begin their interviews and examination. This will continue this week and probably next week and depending on the outcome of their analysis I will need to decide whether or not I need further examination.

Counsel stated that one of the experts would have her first appointment with Doorbal on January 11, and that another expert would only need to meet with   Doorbal one more time. During that same hearing, Doorbal sought another continuance, contending that rule 3.851 allows a trial court to extend the evidentiary hearing for up to ninety days where good cause is shown. As with the prior requests, the trial court denied Doorbal a continuance.

During a status conference held on January 21, 2005, counsel for Doorbal reported that "for the first time in . . . almost 10 years since he was charged we sent a team to Trinidad and we were able to secure those school records and that would have been helpful for people providing mental health mitigation." When asked by the trial court when the defense team went to Trinidad, counsel replied that they had left approximately ten days before and had returned the prior week. Counsel proceeded to again argue that a continuance was necessary because the experts had not yet reviewed all of the records. The trial court denied the request for a continuance, and it was then that counsel stated that she would not call any witnesses to testify at the evidentiary hearing.

Analysis

In light of the actions of counsel for Doorbal prior to the evidentiary hearing, we conclude that it was not an abuse of discretion for the trial court to deny

37

the numerous continuances sought by Doorbal. A review of the record demonstrates that, despite the knowledge of counsel on November 9, 2004, that the evidentiary hearing was scheduled on February 14, 2005, counsel apparently did not take sufficient action to ensure that Doorbal would be fully prepared for that hearing. Instead, counsel seemed to assume that if she could delay the investigation of the mental health claim, the trial court would eventually capitulate and grant a continuance.

There are two specific areas where the conduct of counsel is especially of concern. First, as previously noted, the trial court during a November 16, 2004, hearing informed Doorbal that a hearing would be necessary with regard to whether to transport Doorbal to Miami-Dade County for evaluation. Counsel then proceeded to wait over one month, until December 24, 2004, to ask the trial court to order that Doorbal be transported. During this same hearing, counsel recognized that it could take the Florida Department of Corrections up to three weeks to transport Doorbal to Miami-Dade County. According to the record, Doorbal arrived in Miami-Dade County on approximately January 5, 2005.  The mental health experts did not commence their evaluations of Doorbal until that time.

Even though counsel for Doorbal was on notice that the only claim to be considered at the evidentiary hearing was claim 8(f) (the mental health claim), she waited over a month to again address the issue of transport before the trial court. This date fell less than eight weeks before the evidentiary hearing was scheduled to occur, and counsel was aware that the transport of Doorbal could take up to three weeks. We conclude that postconviction counsel was in large part responsible for the time concerns to evaluate Doorbal, which, in turn, produced a continuance request for the experts to engage in further evaluations. The second noticeable delay with regard to the preparation of this case for an evidentiary hearing is that with respect to the investigation into the background of Doorbal. During the January 21, 2005, hearing, counsel for Doorbal admitted that she had not sent individuals to Trinidad to investigate his background until January 10, 2005, just over one month before the scheduled evidentiary hearing, despite the fact that she had been on notice since November 9, 2004, that the hearing was scheduled for February 14, 2005.

Counsel asserts that a continuance of this case was necessary due to the voluminous amount of records and documents in this case. While we agree that the record in this case is indeed significant even for a capital case, there is no direct correlation between the size of a file and the amount of time necessary to prepare for an evidentiary  hearing on postconviction motions. Moreover, a claim that trial counsel was ineffective for the failure to investigate and present mental health evidence is largely independent of the trial court record. Preparation of such a claim primarily entails an

38

investigation of the background of the defendant and a comprehensive evaluation of that defendant by experts. Here, those timing factors were within the control of Doorbal's counsel.

The decision to wait until nearly two months after the Huff hearing to investigate the background or to involve mental health experts was the cause of the delays of counsel that required Doorbal to seek multiple continuances. Therefore, under the facts as presented by the instant case, we hold that it was not an abuse of discretion for the trial court to refuse to extend the date of the  evidentiary hearing.

The Denial Order

Under this claim, Doorbal contends that the form of the order denying relief fails to provide this Court with guidance for appellate review because it does not reference hearings, transcripts, or any portion of the record. We disagree. We have held that to support a summary denial, the trial court must either state its rationale in the order or attach those portions of the record that refute the claims. *See Nixon v. State*, 932 So. 2d 1009, 1018 (Fla. 2006). Although the denial order in this case is extremely brief to summarily deny a large number of claims, it provides a specific basis why the trial court denied each claim without an evidentiary hearing. Further, with regard to the mental health claim,  the order states that Doorbal withdrew his request for an evidentiary hearing on this claim and determines that Doorbal had failed to carry his burden to demonstrate entitlement to relief. Doorbal fails to present a single case in which this Court has granted relief under similar circumstances. *Cf. Hoffman v. State*, 571 So. 2d 449, 450 (Fla. 1990) (ordering evidentiary hearing on 3.850 motion where the trial court in its summary order stated no rationale for its rejection of the motion, failed to attach to the order portions of the record conclusively showing that relief was not required, and failed to find that the allegations were inadequate or procedurally barred). Therefore, we deny Doorbal relief on this claim. [12]

**********

[12]   Moreover, we have already held that Doorbal waived his challenge to the summary denial of all of his claims but the mental health claim. Since this challenge was waived, the adequacy of the summary denial order is arguably moot.

*See Doorbal III* at 486-89.  Neither of the claims presented to the Florida Supreme Court

alleged that Doorbal was denied access to mental healthcare professionals during his trial

in violation of *Ake*.  Rather, one claim addressed the denial of a motion to continue an

evidentiary hearing in a post-conviction hearing due to post-conviction mental healthcare experts, and the other alleged ineffective assistance of appellate counsel.  In his Reply, Doorbal is attempting to combine his claim for ineffective assistance of appellate counsel for failure to appeal the order denying  the additional funds, and his claim that federal habeas is appropriate because the post-conviction court denied his motion to continue a post-conviction evidentiary hearing on Doorbal's psychological evaluations.  This "hybrid" claim was not presented to the state courts and is therefore unexhausted.  Doorbal could have included a claim for ineffective assistance of appellate counsel based on *Ake* in this case, as that claim was considered by the Florida Supreme Court.   However, Doorbal did not do so.  On the other hand, Doorbal brought a claim based on Judge Ferrer's denial of the motion to continue the post-conviction evidentiary hearing – a claim he also presented to the state courts – but, as already discussed, the manner in which a state court handled a post-conviction proceeding is not a cognizable claim for federal habeas relief.  Therefore, the hybrid *Ake* claim Doorbal raised in his Reply is unexhausted and, as such, is denied.

Finally, even if the claim was properly before me, Doorbal's *Ake* claim fails on the merits.  According to Doorbal, Judge Ferrer's denial of a motion for continuance during the post-conviction proceedings resulted in a violation of Doorbal's right to mental healthcare experts.   However, in *Ake*, the Supreme Court recognized the right to access to psychiatrists during trial, not during a post-conviction hearing.  More importantly, the record indicates that Doorbal had access to mental healthcare experts during trial, and that the state authorized payment of $4,000.00 to the expert.   The Florida Supreme Court found that "the expert did not restrict his mental health evaluation based upon a denial of additional expert funds."  Given the presumption of correctness attached to the state court

40

factual findings, 28 U.S.C. § 2254(e), since Doorbal had access to a mental healthcare expert during the trial, and the expert did not restrict his evaluation despite the state's denial of additional funds,  his *Ake* claim fails on the merits, and habeas relief is denied.

**4.  Doorbal received ineffective assistance from trial counsel.**

A.  <u>Standard of Review for Ineffective Assistance of Counsel Claims</u>

After AEDPA, the standard for assessing ineffective assistance of counsel claims remains that found in *Strickland v. Washington*, 466 U.S. 668 (1984). *See Bradshaw v. Richey*, 546 U.S. 74, (2005).  In *Strickland*, the Supreme Court established a two-prong test for determining whether a convicted person is entitled to habeas relief on the ground his counsel rendered ineffective assistance: (1) whether counsel's representation was deficient, i.e., "fell below an objective standard of reasonableness" "under prevailing professional norms"; and (2) whether the deficient performance prejudiced the defendant, i.e., there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687-88; *Williams v. Taylor*, 529 U.S. 363, 405 (2000); *Darden v. Wainwright*, 477 U.S. 168 (1986); *Chandler*, 218 F.3d 1305, 1312-13 (11th Cir. 2000).  At all times, Petitioner bears the burden of proving not only that his counsel's representation fell below an objective standard of reasonableness, *Johnston v. Singletary,* 162 F.3d 630, 635 (11th Cir. 1998); *Roberts v. Wainwright*, 666 F.2d 517, 519 n.3 (11th Cir. 1982), but also that he suffered actual, substantial prejudice as a result of the deficient performance. *Strickland*, 466 U.S. at 688-94.

In assessing an ineffectiveness claim, the Court must start from a "strong

presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 688-89.  The standard for evaluating "counsel's performance is 'reasonableness under prevailing professional norms.'" *Chandler v. United States*, 218 F.3d at 1313 (quoting *Strickland*, 466 U.S. at 688).  However, "[t]he test for ineffectiveness is not whether counsel could have done more;  perfection is not required.  Nor is the test whether the best criminal defense attorneys might have done more.  Instead, the test is ... whether what they did was within the 'wide range of reasonable professional assistance.'" *Waters v. Thomas*, 46 F.3d 1506, 1518 (11th Cir. 1995) (citations omitted); *see Burger v. Kemp*, 483 U.S. 776, 789 (1987).  Effective assistance does not mean errorless assistance; instead, counsel's performance must be judged in light of the entire record rather than specifications. *Green v. Zant*, 738 F.2d 1529 (11th Cir. 1984).

"The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one." *Jones v. Campbell*, 436 F.3d 1285, 1293 (11th Cir. 2006).  A Court must "judge the reasonableness of counsel's conduct on the facts of the particular case, viewed as of the time of counsel's conduct."  *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000) (quoting *Strickland*, 466 U.S. at 690).  This judicial scrutiny is "highly deferential," *id.,* as a court must adhere to a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689-90; *Mills v. Singletary*, 161 F.3d 1273, 1286 (11th Cir. 1998), (citing *Baldwin v. Johnson*, 152 F.3d 1304, 1311 (11th Cir. 1998); *Bolender v. Singletary*, 16 F.3d 1547, 1557 (11th Cir. 1994)).  A reviewing court will not second-guess strategic

decisions; instead, counsel's performance is evaluated in light of all the circumstances as they existed at the time of the conduct, and is presumed to have been adequate. *Strickland,* 466 U.S. at 689-90.

The fact that a particular defense was unsuccessful does not prove ineffective assistance of counsel. *Chandler*, 218 F.3d at 1314.  "[C]ounsel cannot be adjudged incompetent for performing in a particular way in a case, as long as the approach taken 'might be considered sound trial strategy.'" *Id.*  (quoting *Darden v. Wainwright*, 477 U.S. 168 (1986)).  Explaining its definition of "strategy",[10] the Eleventh Circuit Court of Appeals stated:

> trial counsel's course of conduct, ... was neither directly prohibited by law nor directly required by law, for obtaining a favorable result for his client.  For example, calling some witnesses and not others is 'the epitome of a strategic decision.'  [*Waters*, 46 F.3d at 1512] (en banc);  *see also id.* at 1518-19 (en banc);  *Felker v. Thomas*, 52 F.3d 907, 912 (11th Cir. 1995) (whether to pursue residual doubt or another defense is strategy left to counsel, which court must not second-guess);  *Stanley v. Zant*, 697 F.2d 955, 964 (11th Cir. 1983) (stating that reliance on line of defense to exclusion of others is matter of strategy).

*Chandler*, 218 F.3d at 1314 n.14; *see also United States v. Fortson*, 194 F.3d 730, 736

---

[10]

As stated in *Strickland*, 466 U.S. at 690-91:

> ... strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

(6th Cir. 1999) (denying relief on ineffectiveness claim because reviewing court "[could] conceive of numerous reasonable strategic motions" for counsel's trial actions even though the district court did not make factual findings or grant an evidentiary hearing).

Because there is a presumption of reasonableness, in order to establish that counsel's conduct was unreasonable, the petitioner must prove "that no competent counsel would have taken the action that his counsel did take." *Chandler*, 218 F.3d at 1315; *Waters*, 46 F.3d at 1512 (stating "[t]he test has nothing to do with what the best lawyers would have done.  Nor is the test even what most good lawyers would have done.  We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial."); *Provenzano v. Singletary*, 148 F.3d 1327, 1332 (11th Cir. 1998) (noting counsel's conduct is unreasonable only if petitioner shows "that no competent counsel would have made such a choice").  "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689.

In the event deficient performance is proven, a petitioner is required to demonstrate prejudice before he is entitled to relief.  Prejudice is shown where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  For claims of guilt phase ineffectiveness, prejudice is defined as whether there is a reasonable probability the result of the trial would have been different; *i.e.* whether confidence in the outcome is undermined. *Id.*  Similarly, prejudice in the penalty phase is assessed by re-weighing "the

evidence in aggravation against the totality of available mitigating evidence" to determine if the "probability is sufficient to undermine confidence in the outcome." *Wiggins*, 123 S.Ct. at 2542.  The burden of proof for showing ineffective assistance is, and remains, on the Petitioner. *Roberts v. Wainwright*, 666 F. 2d 517, 519 n.3 (11th Cir. 1982).  *See Jones v. Kemp,* 678 F. 2d 929, 932 (11th Cir. 1982).

In this case, Doorbal must prove his counsel's performance was below constitutional standards, and that he suffered prejudice as a result. Further, to obtain habeas corpus relief, Doorbal "must do more than satisfy the *Strickland* standard. He must show that in rejecting his ineffective assistance claim, the state court 'applied *Strickland* to the facts of his case in an objectively unreasonable manner.'" *Rutherford v. Crosby*, 385 F.3d 1300, 1309 (11th Cir. 2004) (quoting *Bell v. Cone*, 535 U.S. 685, 699 (2002)).

B.    Analysis

In his fourth and final claim, Petitioner asserts that he is entitled to federal habeas relief because his trial counsel was allegedly ineffective for failing to object to the admission of certain evidence and the making of certain comments at trial.  Specifically, Petitioner asserts ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984) due to trial counsel's failure to object to: (1) improper character evidence; (2) improper comments on Petitioner's exercise of his right to remain silent by not testifying at trial; and, (3) comments violating the "Golden Rule" during closing argument at trial and during the guilt phase of the trial.  According to Petitioner, under the authority of *Cuyler v. Sullivan*, 466 U.S. 335 (1980), the prejudice prong of the *Strickland* test is presumed because trial counsel had an emotional and a financial conflict of interest.  Specifically,

45

Petitioner argues that trial counsel's failure to object was caused by counsel's emotional conflict arising from the death of counsel's father and the illness of counsel's mother, and the financial hardship suffered as a result of Doorbal's representation.

As an initial matter, I note that *Sullivan* is inapplicable to this case. In *Sullivan*, the Supreme Court reaffirmed its prior holding that "a lawyer forced to represent codefendants whose interests conflict cannot provide the adequate legal assistance required by the Sixth Amendment." *Sullivan*, 446 U.S. at 349 (citing *Holloway v. Arkansas*, 435 U.S. 475, 481-82 (U.S. 1978)). Moreover, where a defendant does not object to multiple representation at trial, the defendant is required to show that an actual conflict existed. If actual conflict is shown, prejudice is presumed. The Court further explained that

> unconstitutional multiple representation is never harmless error. Once the Court concluded that [a] lawyer had an actual conflict of interest, it refused to indulge in nice calculations as to the amount of prejudice attributable to the conflict. The conflict itself demonstrated a denial of the "right to have the effective assistance of counsel. Thus, a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief. But until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance.

*Id*. at 349-50 (internal quotations and citations omitted).

More recently, in *Mickens v. Taylor*, 535 U.S. 162 (2002), the Supreme Court stated that an exception to the general two-pronged analysis of *Strickland* sometimes exists when the defendant's attorney actively represented conflicting interests. *Id.* at 1241. In addition, the Supreme Court clarified that under the exception, "prejudice will be presumed *only if* the conflict has significantly affected counsel's performance -- thereby rendering the verdict unreliable, even though *Strickland* prejudice cannot be shown." *Id.* (emphasis added).

Justice Scalia, writing for the majority of the Court, expressed disapproval of the holdings of Courts of Appeals, "which have applied *Sullivan* 'unblinkingly' to 'all kinds of alleged attorney ethical conflicts'". *Id.* at 174.   Specifically, the Court disapproved of courts that

> have invoked the *Sullivan* standard not only when (as here) there is a conflict rooted in counsel's obligations to former clients, but even when representation of the defendant somehow implicates counsel's *personal or financial interests*, including a book deal, a job with the prosecutor's office, the teaching of classes to Internal Revenue Service agents,  a romantic "entanglement" with the prosecutor, or fear of antagonizing the  trial judge.

*Id.* (internal quotations and citations omitted) (emphasis added).  The majority of the Court concluded "that the language of *Sullivan* itself does not clearly establish, or indeed even support, such expansive application. Until, it said, a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance... *Sullivan* ... stressed the high probability of prejudice arising from multiple concurrent representation, and the difficulty of proving that prejudice. " *Id.* at 175.

In the Eleventh Circuit, a conflict of interest rises to the level of ineffective assistance of counsel when "a lawyer has inconsistent interests."  *Freund v. Butterworth*, 165 F.3d 839, 859 (11th Cir. 1999) (internal citations omitted).  If Petitioner can show that his counsel operated under a conflict of interest, he must then show that the conflict "adversely affected" counsel's performance. *Mickens v. Taylor*, 535 U.S. 162, 174, 122 S. Ct. 1237, 152 L. Ed. 2d 291 (2002). In order to prove adverse effect, Petitioner must show (1) a plausible alternative defense strategy that counsel might have pursued; (2) that the alternative strategy was reasonable; and (3) some link between the actual conflict and the

decision to forego that strategy. *Freund*, 165 F.3d at 860.

Here, Doorbal argues that trial counsel's conflict was personal and financial – the very same of type of conflicts Justice Scalia stated the *Sullivan* standard does not apply to. Moreover, given the substantial evidence against him adduced at trial, including Delgado's testimony and physical evidence recovered from Doorbal's house, Petitioner cannot show that the comments complaint of have rendered the verdict unreliable. For these reasons, the two-pronged *Strickland* standard is applicable to Doorbal's claim.

As to the merits of this claim, on direct appeal, the Florida Supreme Court rejected Doorbal's argument that his trial counsel was ineffective by stating:

   Improper Character Evidence

> Doorbal next contends that harmful error occurred when various witnesses for the State made statements whose only purpose was to establish Doorbal's propensity to commit bad acts or to highlight Doorbal's bad character. Doorbal further notes that because he did not testify in his own defense, the issue of his character was never at issue in his trial. Doorbal fails to mention, however, that he did not contemporaneously object to any of the statements he now attempts to question. [FN37] We can therefore analyze the comments only under the fundamental error doctrine, which requires that an offending comment "reach[] down into the validity of the trial itself to the extent that a verdict of guilty or jury recommendation of death could not have been obtained without the assistance of the alleged error." *McDonald v. State*, 743 So. 2d 501, 505 (Fla. 1999)(quoting *Urbin v. State*, 714 So. 2d 411, 418 n.8 (1998)); *see also Chandler v. State*, 702 So. 2d 186, 191 n.5 (Fla. 1997)(describing fundamental error as error which is "so prejudicial as to vitiate the entire trial"). We determine that no fundamental error occurred to warrant relief.

> The first comments challenged by Doorbal are those made by Mario Sanchez, who claimed to have had a stormy association with Doorbal. Sanchez participated in the abduction of Marc Schiller by assisting Doorbal in forcing Schiller into the waiting van in the parking lot of Schiller's restaurant. At trial, Sanchez testified that he once heard [Petitioner] say to another weightlifter at Sun Gym:

> [W]hen I get mad I'll do anything. I'll cut--I'll start up a chain

48

saw and cut somebody up just to see the blood spurting. . . .
I'll go into a house and tie everybody up, grandmother, mother,
daughter. . . . And I'll shoot--I'll start shooting everybody until
they give me what I want.

Sanchez made this response in answer to the State's question of whether
Doorbal had ever done or said anything that would make him fearful of
Doorbal. The State argues that rather than showing [Petitioner's] propensity
to commit bad acts, or the bad nature of Doorbal's character, Sanchez's
testimony was relevant to explain why Sanchez did not report the kidnaping
of Schiller to the police and to establish Sanchez's fear of Doorbal. We
agree. Sanchez's testimony does not test the outer bounds of relevancy such
that its presentation to the jury resulted in error that was fundamental or "so
prejudicial as to vitiate the entire trial." *Chandler*, 702 So. 2d at 191 n.5. It
was for the jury to assess the credibility of Sanchez's testimony, and to weigh
it accordingly. No relief based on fundamental error is warranted.

Doorbal next challenges testimony by Sabina Petrescu, Lugo's girlfriend,
who related that Lugo once told her that [Petitioner] was a killer in his native
country. The State counters that Lugo also informed Petrescu that he worked
for the CIA and that Doorbal assisted him in his missions. Moreover, the
State asserts that Lugo told Petrescu that he, along with Doorbal, was
targeting Schiller as part of a CIA mission. Thus, the State continues,
Petrescu's testimony was relevant to establish why she accompanied Lugo
and Doorbal on what she believed to be one of their missions. That "mission"
was the one in which Lugo and Doorbal arrived at Griga's house, each with
a concealed firearm, under the guise of presenting a computer as a gift to
him, only to abort the plot after a fifteen-minute stay. [FN38] Again, the jury
was entitled to weigh Petrescu's credibility as to her statements about
Doorbal's activity. Her testimony was relevant as to why she accompanied
Lugo and Doorbal on one of their abduction plots and it assisted in laying a
framework for what she observed, including the pair's deliberate act in
placing a suitcase containing syringes and handcuffs in the car with them,
their purchase of duct tape before arriving at Griga's home, and their arrival
at Griga's home with concealed firearms. We decline to grant relief based on
fundamental error.

Finally, on this issue, Doorbal claims that error occurred when Frank
Fawcett, a person with whom Lugo and Doorbal had previously conducted
business, testified that he once overheard Doorbal threaten to kill his
girlfriend while Doorbal  was speaking on the telephone. Fawcett also
testified that once when he telephoned Doorbal about a certain matter,
Doorbal tersely replied that he could not be bothered because he was
making a bomb. Our examination of the context in which Fawcett made
these comments leads us to doubt their relevancy. Their relationship to

49

matters material to Doorbal's trial is strained at best. However, we also note that the comments were relatively isolated incidents in a protracted trial. When we further note the overwhelming amount of unrebutted evidence presented against Doorbal, we cannot conclude that Fawcett's comments "reache[d] down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." *McDonald*, 743 So. 2d at 505. Relief based on fundamental error is not warranted.

Fundamental Error in State's Closing Argument

Doorbal claims next that reversible error occurred during the State's guilt-phase closing argument. Doorbal contends that the State impermissibly commented on his right to remain silent. He also asserts that the State made an improper "Golden Rule" argument to the jury. Doorbal did not contemporaneously object to either set of comments. Therefore, the only possible basis for relief is fundamental error. We determine that no fundamental error occurred with regard to either set of comments.

A. Right to Remain Silent

During her closing argument, the prosecutor made the following statements:

> It doesn't matter how many years Jorge Delgado is going to do, it's not enough. . . . The issue is, did he tell you the truth and what did he tell you? . . .

> Another thing is that--listen to the cross examination of Jorge Delgado. Try and recall it. Never once was it anybody else but defendant [Petitioner] that was the hands-on killer. Lugo, along with hands-on killer [Petitioner]. Never once did anybody else get up once to say anything different.

Doorbal asserts that he is entitled to relief based on our opinion in *Rodriguez v. State*, 753 So. 2d 29 (Fla. 2000). The comments challenged in this case are not even in the same category as those in *Rodriguez*. Additionally, in *Rodriguez* the prosecutor made two sets of statements that could have been construed as being impermissible comments on the defendant's failure to testify. After the first comments [FN39] in *Rodriguez*, the court sustained the defendant's objection but denied his motion for mistrial. Therefore, under the proper standard of review, we determined that the trial court did not abuse its discretion in denying the motion for mistrial. *See id.* at 39 (citing *Cole v. State*, 701 So. 2d 845, 853 (Fla. 1997), in which we noted that "[a] motion for mistrial should be granted only when it is necessary to ensure that the defendant receives a fair trial"). After the second set of comments [FN40] in

*Rodriguez*, which were also qualitatively different, the trial court overruled the defendant's objection. Under the proper standard of review, we determined that these comments were harmless beyond a reasonable doubt. *See Rodriguez*, 753 So. 2d at 39. Neither the abuse of discretion standard nor the harmless error standard applies in Doorbal's case because Doorbal neither made a motion for mistrial, nor contemporaneously objected, with regard to the prosecutor's remarks. [FN41] Rather, as stated above, in our review for fundamental error we must determine whether the prosecutor's statements constituted "error that reache[d] down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." *McDonald*, 743 So. 2d at 505. When we consider the statements, along with the magnitude of physical and testimonial evidence related not only to the crimes against Schiller but also to those against Griga and Furton, we are convinced that the prosecutor's remarks at issue here did not affect the jury's verdict. Therefore, we decline Doorbal's request for relief. Finally, we note that although the standards of review applied in *Rodriguez* are inapplicable here, one aspect of our language in Rodriguez is entirely pertinent: "[W]e strongly caution prosecutors against making comments that may be interpreted as comments on the defendant's failure to testify or that impermissibly suggest a burden on the defendant to prove his or her innocence." *Rodriguez*, 753 So. 2d at 39.

B. Golden Rule

Doorbal also claims that he is entitled to relief based on the following remarks by the prosecutor during closing argument in the guilt-innocence phase:

> Remember [the police detective who] came in and showed you how that Omega taser works. Many of you jumped. Can you imagine how that would feel on your skin right up close? How it felt on Marc Schiller's sweating legs and ankles. But, again and again until he signed over everything. Signed over his entire life.

These statements are erroneous and needlessly violated the prohibition against "Golden Rule" arguments, because they asked jurors to place themselves in the position of the victim. However, in the absence of a contemporaneous objection, we must determine whether the guilty verdict could not have been obtained without the assistance of the error. *See McDonald*, 743 So. 2d at 505. As noted above, a mountain of physical and testimonial evidence established Doorbal's responsibility for the crimes with which he was charged. Therefore, we conclude that the remark, though erroneous, was also isolated and did not affect the jury's verdict. No relief is

51

warranted.

Nevertheless, we express our distress that a seasoned prosecutor would flagrantly violate the prohibition on "Golden Rule" arguments in any case, and particularly under the circumstances here. Well before admission to The Florida Bar, law students learn that they must not resort to improper "Golden Rule" arguments. Undoubtedly, prosecutors in capital cases are aware of this Court's remonstrations to all attorneys that they not violate this principle of law. A prosecutor in a capital case is entrusted to seek only justice when life or death may be at stake. We fully expect that those representing the State in cases such as this will not walk the edge of reversible error, which is unfortunate conduct, isolated though it was.

PENALTY PHASE

State's Closing Argument

Doorbal further asserts that he is entitled to relief based on the State's penalty phase closing argument. He again challenges two sets of remarks, the first of which discussed aspects of Doorbal's proffered mitigation. The State argued:

> And he still had a chance to bond with his father. And again, the mitigation in whatever is Ms. Laroche [sic] because of the fact that she was raped at thirteen, you cannot blame his childhood on that. It doesn't mitigate his moral responsibility. The moral responsibility as a human being, as a person that lives in society. And I don't know, but to say that where I live, if I live in Trinidad or if you live in Trinidad or you live in the United States, you don't do the things this defendant did.

Doorbal did not contemporaneously object. In *Gomez v. State*, 751 So. 2d 630 (Fla. 3d DCA 1999), the district court reversed the defendant's conviction, based on fundamental error, due to the numerous improper comments by the prosecutor during closing argument. The prosecutor more than once referred to the defendant as a liar. She also characterized him as a "zero" who had no credibility, called his version of events a "cockamamie story," and made Golden Rule arguments in which she suggested that the jurors would not have acted in the same criminal way as the defendant if they had been in his shoes. [FN42] *See id.* at 632. Doorbal relies on *Gomez* for the proposition that similar remarks made by the prosecutor in his trial constitute fundamental error which warrants a new penalty phase. We disagree. In *Gomez*, the frequency of the prosecutor's comments was as much at issue as their offensiveness. The statements in this case were not improper comments on the evidence, and we note the lengthy nature of the

52

prosecutor's closing argument and the isolated nature of the comments. We are convinced that this argument in this instance, even if erroneous, was not a determining factor in the jury's ultimate recommendation of death. Therefore, we deny relief.

Doorbal also contends that fundamental error occurred due to the following statements by the prosecutor:

> [Griga has] already been moved into the bath tub so his blood could bleed out through the brain and what happens when Lugo calls? This is why you know that he is a cold-blooded killer. The bitch is cold. Those were his words. His words. The bitch is cold.

> Not Lugo's words. Is that a value of human life? Does he deserve to spend the rest of his life in prison? See sisters and going to the library helping others? He deserves nothing. He deserves no mercy and he deserves no leniency. He deserves no respect. . . .

> It is about [Frank Griga's] goodness and about his well-being as a human. It is about Furton. It is the fact of what's left of them. He deserved no mercy for this.

Doorbal did not voice an objection to these comments during trial. We determine that while erroneous, the prosecutor's "no mercy" comments do not rise to the level of error such that the jury's recommendations of death could not have been made without reliance upon them. [FN43] *See McDonald*, 743 So. 2d at 505. However, we remind prosecutors that they tread on dangerous ground when they present "no mercy" arguments.

* * * *

[FN37] Doorbal avers that his codefendant, Mese, objected to certain statements at issue. However, the trial judge specifically informed counsel for each defendant that no defendant would be allowed to share in the objection of a codefendant. Therefore, [Petitioner] did not preserve the issue for review. *See Johnson v. State*, 726 So. 2d 359, 360 (Fla. 1st DCA 1999)(defendant did not preserve for review the issue of admissibility of testimony when only his codefendant contemporaneously objected); *see also* Charles W. Ehrhardt, Florida Evidence § 104.1 (2001 ed.).

[FN38] Lugo arranged another meeting with Griga later that evening, which set in motion the events which led to charges of kidnaping, attempted extortion, and double murder.

[FN39] These comments alluded to the defendant's lack of an explanation for who else but himself and another State witness (who was a codefendant and who arranged a plea bargain in exchange for testifying for the State) could have been in the room where the murders were committed. *See Rodriguez*, 753 So. 2d at 37.

[FN40] These comments alluded to the fact that although the jurors were asked during the jury selection process whether they could "listen . . . to both sides of the story . . . there was nothing in the direct or cross examination of any witness who testified that pointed to any other person being involved other than [the witness who testified for the State in exchange for a plea bargain] and [the] defendant. There were no two sides." *Rodriguez*, 753 So. 2d at 37.

[FN41] We further note that in the other cases on which Doorbal relies with regard to this issue, review for fundamental error was not the applicable standard.

[FN42] The defendant objected a total of sixteen times to the prosecutor's remarks.

[FN43] The cases on which Doorbal relies are distinguishable. In *Urbin v. State*, 714 So. 2d 411 (Fla. 1998), we reversed the sentence of death based on a lack of proportionality. We also noted that the prosecutor engaged in a closing argument that was one of the most egregious examples of misconduct that we had seen, including ridiculing actions of the defendant's mother, using variants of the word "execution" at least nine times, and repeatedly dehumanizing the defendant and inviting the jury to disregard the law. *See id.* at 420-22. The prosecutor's conduct in the instant case, while erroneous, does not rise to the deplorable level of *Urbin*. We distinguish *Rhodes v. State*, 547 So. 2d 1201 (Fla. 1989), and *Garron v. State*, 528 So. 2d 353 (Fla. 1988), on the same basis. In *Rhodes*, the prosecutor compared the defendant to a vampire without justification, improperly argued that the HAC aggravator applied based on the defendant's actions after the body was dead, and clearly misstated the law with regard to a mandatory twenty-five year sentence for first-degree murder. The events in the instant case are not comparable. In *Garron*, the frequency and egregiousness of the comments justified reversal of the defendant's death sentence and remand for a new trial. The prosecutor in Garron repeatedly misstated the law and injected emotion and fear into the trial "in such a way as to render the whole proceeding meaningless." *Garron*, 528 So. 2d at 359. While unfortunate, the prosecutor's remarks and behavior at issue in the instant case are not as egregious as those of the prosecutor in *Garron*.

54

*Doorbal I*, 837 So. 2d at 954-59.

In his motion for state post-conviction relief, Petitioner asserted in one claim that his counsel's emotional and financial issues rendered him ineffective; he argued both that the personal issues met the standard for ineffective assistance of counsel established in *Strickland*, and created a conflict of interest such that *Sullivan* applied.   In a separate claim, Petitioner argued that his counsel was ineffective for failing to object to testimony amounting to  inadmissible bad character evidence on direct appeal and the comments in closing that were raised on direct appeal. In a third claim, Petitioner argued that the trial court had instructed the jury that sympathy and mercy were not proper considerations in deciding Petitioner's guilt, that the State had argued that sympathy and mercy were not mitigating circumstances and that counsel was ineffective for failing to object.  The state post -conviction court summarily denied these claims by the stating:

> Claim V is denied as it restates the allegations raised elsewhere in the Motion that Doorbal's trial counsel was ineffective, but adds only the alleged reason for his being ineffective, to wit, because the case was a tremendous financial burden and counsel recently suffered the loss of his father. Accordingly, the Claim is denied.
>
> Claim VI is denied because Doorbal has failed to allege incidents of ineffectiveness which, if true, would result in a different outcome within a reasonable probability.
>
> * * * *
>
> Claim XXI is denied because it is procedurally barred.  The arguments and instructions challenged could have been raised on direct appeal.  In any event, there  is no merit to the errors claimed.

(App. N-Vol. 5 at 783-84).

In his post-conviction appeal, Petitioner asserted that the post-conviction court had erred in failing to grant an evidentiary hearing because he met the standard for being

granted an evidentiary hearing under Florida law; and, in a separate issue, he claimed that the denial of his post-conviction needed to be reversed because the state post-conviction court had entered and order that was insufficient to permit review.  The Florida Supreme Court rejected both claims and concluded that any issue about the summary denial of the claims in the motion for post-conviction relief had been waived under Florida law:

> Under this claim, Doorbal contends that the trial court erroneously denied all but one of his claims without an evidentiary hearing. However, we conclude that this issue is insufficiently pled. This Court has held that vague and conclusory allegations on appeal are insufficient to warrant relief. For example, in *Smith v. State*, 931 So. 2d 790, 800 (Fla.), *cert. denied*, 127 S. Ct. 587, 166 L. Ed. 2d 436 (2006), the defendant contended in his brief that during the evidentiary hearing, the trial court improperly precluded him from presenting "some evidence" on some of his *Brady* and *Giglio* claims. This Court rejected the claim for two reasons, one of which was that the contention was vague and conclusory. *See id.* We noted that in the initial brief, the defendant did not identify any evidence that was improperly excluded, nor did he specify any claim that the court wrongfully excluded from the evidentiary hearing. *See id.* Further, this Court has stated that the purpose of an appellate brief is to present arguments in support of the points on appeal. *See Randolph v. State*, 853 So. 2d 1051, 1063 n.12 (Fla. 2003). Therefore, to merely refer to arguments presented during the post-conviction proceedings without further elucidation is not sufficient to preserve issues, and these claims are deemed to have been waived. *See id.*

> With regard to this issue, the argument by Doorbal is entirely conclusory. Doorbal provides a timeline of the case and details the standard to be applied for review of the summary denial of claims, but the remainder of his argument with regard to this claim consists of the following:

>> Doorbal's Motion to Vacate Judgments of Convictions and Sentences, trial court error, prosecutorial misconduct and effective assistance of counsel claims in [Petitioner's] Rule 3 were raised in his Motion to address a pattern of deficient conduct demonstrated by counsel and because this Court was forced to apply a fundamental error analysis when reviewing unpreserved claims raised on Doorbal's direct appeal.

>> In this case, the trial Court summarily denied Doorbal's claims without an evidentiary hearing and failed to provide this Court with an Order stating its rationale or attaching to its Order

those specific parts of the record that refute each claim presented in the motion.

Doorbal neither states the substance of any of the claims that were summarily denied, nor provides an explanation why summary denial was inappropriate or what factual determination was required on each claim so as to necessitate an evidentiary hearing. We conclude that this general, conclusory argument is insufficient to preserve the issues raised in the 3.851 motion, and, therefore, this claim is waived. *See Randolph*, 853 So. 2d at 1063 n.12.

In light of this conclusion, we are compelled to remind attorneys who represent capital defendants of the importance of compliance with minimal pleading requirements to allege a claim of ineffective assistance of trial counsel. In *Downs v. State*, 453 So. 2d 1102, 1104-05 (Fla. 1984), this Court explained that a defendant who seeks to present such a claim must (1) identify a specific omission or overt act upon which the claim is based, (2) demonstrate  that the omission or act was a substantial deficiency which fell measurably below that of competent counsel, and (3) demonstrate that the deficiency probably affected the outcome of the proceedings. If a capital defendant fails to plead in accordance with these criteria, the claim will not meet the threshold for facial sufficiency. As a result, claims may not receive an evidentiary hearing or be considered by the trial court on the merits.

Various claims raised by Doorbal in this 3.851 proceeding were plagued by a lack of sufficiency in that [Petitioner] failed to allege a specific omission or overt act upon which his claim of ineffective assistance was based. For example, in claim 8(a), Doorbal contended that the death of the father of trial counsel Anthony Natale immediately prior to trial and the illness of his mother interfered with his representation of Doorbal and caused him to render ineffective assistance. During the *Huff* hearing, the trial court refused to grant an evidentiary hearing on claim 8(a) because [Petitioner] had not specified actions which counsel Natale failed to take during the trial:

COURT: I don't think I need an evidentiary basis for [claim 8(a)]. I think that an attorney can for whatever reason fail to preserve error, and that is the problem, and an attorney could also have his father die and do a completely effective trial the next day and not have error at all. So I don't think that [8(a)] is really the key point.

COUNSEL: What did your Honor just say? An attorney's father could die and you could--

COURT: And he could proceed to trial the next day and do a

57

completely effective job.

COUNSEL: Did you decide a case where that happened?

COURT: No, I am not citing a case. What I am saying is that it is not a factual issue of whether the attorney was so disturbed at the death of his father or the attorney and their father had a very lousy relationship and he really didn't feel displaced that his father had passed away, that is not the factual issue. The factual issue is did the attorney provide sub-par representation. And if he did, he did. And if he didn't, he didn't. Regardless of whether his father had passed away or his mother had passed away.

. . . I don't see it.

Later in the hearing, the trial court elaborated that the only omissions alleged by Doorbal were the failure of counsel Natale to object to trial court error and prosecutorial misconduct, but that these claims of error had been raised on direct appeal, and this Court determined that these omissions did not rise to the level of reversible error. *See Doorbal*, 837 So. 2d at 954-59. Therefore, the trial court concluded that these omissions could not serve as a basis for a claim of ineffective assistance of counsel.

During oral argument before this Court, counsel for Doorbal asserted for the first time that counsel Natale was ineffective because, due to the poor health and ultimate death of his father, he was not present at "most" of the witness depositions. When asked how many depositions counsel Natale failed to attend, post-conviction counsel could not provide the number. Instead, counsel responded that she would have obtained that information had Doorbal been granted an evidentiary hearing on this claim.

As the foregoing demonstrates, the rule 3.851 proceedings in the trial court, and on appeal before this Court, have been plagued by generality and lack of specificity. Counsel for Doorbal appears to operate under the incorrect assumption that conclusory, nonspecific allegations are sufficient to obtain an evidentiary hearing on claims of ineffective assistance of counsel, and specific facts and arguments need not be disclosed or presented until the evidentiary hearing. We strongly reiterate to those who represent capital defendants in post-conviction proceedings that claims of ineffective assistance of counsel must comply with the pleading requirements enunciated by this Court in *Downs* at the time that the initial rule 3.851 motion is filed to be legally sufficient under the rule.

* * * *

Under this claim, Doorbal contends that the form of the order denying relief fails to provide this Court with guidance for appellate review because it does not reference hearings, transcripts, or any portion of the record. We disagree. We have held that to support a summary denial, the trial court must either state its rationale in the order or attach those portions of the record that refute the claims. *See Nixon v. State*, 932 So. 2d 1009, 1018 (Fla. 2006). Although the denial order in this case is extremely brief to summarily deny a large number of claims, it provides a specific basis why the trial court denied each claim without an evidentiary hearing. Further, with regard to the mental health claim, the order states that Doorbal withdrew his request for an evidentiary hearing on this claim and determines that Doorbal had failed to carry his burden to demonstrate entitlement to relief. Doorbal fails to present a single case in which this Court has granted relief under similar circumstances. *Cf. Hoffman v. State*, 571 So. 2d 449, 450 (Fla. 1990)(ordering evidentiary hearing on 3.850 motion where the trial court in its summary order stated no rationale for its rejection of the motion, failed to attach to the order portions of the record conclusively showing that relief was not required, and failed to find that the allegations were inadequate or procedurally barred). Therefore, we deny Doorbal relief on this claim. [FN12]

* * * *

[FN12] Moreover, we have already held that Doorbal waived his challenge to the summary denial of all of his claims but the mental health claim. Since this challenge was waived, the adequacy of the summary denial order is arguably moot.

*Doorbal III*, 983 So. 2d at 482-89.

In the instant federal habeas proceeding, Doorbal argues that the application of the procedural bar was in violation of both federal law, as discussed in *Ford v. Georgia*, 498 U.S. 411 (1991), and Florida law, as stated in *Spera v. State,* 971 So.2d 754 (Fla. 2007). In as much as Doorbal argues that the Florida Supreme Court's decision violated Florida's rules or law, the claim is not cognizable in a federal habeas proceeding  *Engle v. Issac*, 456 U.S. 107, 119 (1982) (federal habeas does not lie for alleged violations of state law); *Machin v. Wainwright*, 758 F.2d 1431, 1433 (11th Cir. 1985) ("[A] state's interpretation of its own laws or rules provides no basis for federal habeas corpus relief, since no question

of a constitutional nature is involved. The federal courts must defer to a state court's interpretation of its own rules of evidence and procedure.").  Additionally, the finding of the Florida Supreme Court that this claim is procedurally barred is an independent and adequate state ground sufficient to stand as a basis for the denial of habeas relief. *Harris v. Reed,* 489 U.S. 255, 261-62 (1989); *Judd v. Haley,* 250 F.3d 1308, 1313 (11th Cir. 2001); Marek v. Singletary, 62 F.3d 1295, 1301-02 (11th Cir. 1995).  First, the state court clearly and expressly stated that it was relying on state procedural rules to resolve the federal claim without reaching the merits of that claim. Second, the state court's decision rested solidly on state law grounds, without being intertwined with an interpretation of federal law. Third,  the state procedural rule was adequate.  *See Judd*, 250 F.3d at 1313 (discussing the three part test announced in *Card v. Dugger*, 911 F.2d 1494 (11th Cir. 1990) to determine when a state court's procedural ruling constitutes an independent and adequate state rule of decision).  Since the Florida Supreme Court imposed a procedural bar to Doorbal's claim of ineffectiveness of trial counsel, this claim is not properly before this Court for habeas review, and relief is denied on this basis.

Notwithstanding the procedural bar, the claim fails on its merits as well.  Under established federal law, remarks which did not draw a contemporaneous objection at trial are reviewed for plain or fundamental error. *Berger v. United States*, 295 U.S. 78 (1935); *United States v. Morris*, 568 F.2d 396, 402 (5th Cir. 1978).  Under this standard, the Florida Supreme Court denied Doorbal's claims of ineffective assistance of trial counsel in Doorbal's direct appeal for his failure to show prejudice.  The rejection of the claim by the state court was not contrary to, or an unreasonable application of, *Strickland*.  The

language of the state post-conviction court's order indicate that the state court correctly understood that *Strickland* provided the standard for adjudicating claims of ineffective assistance of counsel and the standard it provided.   If the admission of the comments complained of do not constitute fundamental error, then Doorbal is not able to show prejudice sufficient to satisfy the requirements of *Strickland* for trial counsel's failure to object during trial.  In other words, Doorbal cannot show that but for counsel's failure to object to the comments, the result of the proceedings, either at trial or on appeal, would have been different.  Therefore, the ineffective assistance of counsel claim also fails on the merits, and habeas relief must be denied.

IV.    Conclusion

For all of the reasons discussed above, Doorbal has failed to meet his burden to warrant habeas relief.  As to each of the four claims in his petition, Doorbal has failed to show that the Florida Supreme Court's decisions were contrary to or an unreasonable application of clearly established federal law.  As such, his petition for habeas relief must be dismissed.  Accordingly, it is hereby ORDERED AND ADJUDGED:

1.      Doorbal's Petition for Writ of Habeas Corpus [DE 1] is DENIED.

2.      This case is CLOSED.

3.      All other motions are DENIED as moot and all hearings are CANCELED.

DONE AND ORDERED in Chambers at Miami, Florida, this 9th day of September, 2008.

THE HONORABLE ALAN S. GOLD
UNITED STATES DISTRICT JUDGE

cc:    U.S. Magistrate Judge Chris M. McAliley
       Counsel of Record